**MARVEL SPECIALTY COMPANY, Inc., Appellant and Cross-Appellee,**

v.

**BELL HOSIERY HILLS, INC., Appellee and Cross-Appellant.**

**No. 9112.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 12, 1963.

Decided April 3, 1964.

Robert F. Conrad, Washington, D. C. (Watson, Cole, Grindle & Watson, Washington, D. C., on brief), for appellant and cross-appellee.

Clifton T. Hunt, Jr., Charlotte, N. C. (Paul B. Bell and Eaton, Bell, Hunt & Seltzer, Charlotte, N. C., on brief), for appellee and cross-appellant.

Before HAYNSWORTH and BOREMAN, Circuit Judges, and BARKSDALE, District Judge.

BOREMAN, Circuit Judge.

This is an action for patent infringement. The District Court found the patent valid and infringed by one accused device but not infringed by another. Both parties have appealed.

The patent in suit is United States patent No. 2,570,637, entitled "Method of and Apparatus for Mending Hosiery" issued to Merle M. Brown in October of 1951 and relates to a method and machine for repairing "pulled threads" in knitted fabrics. However, at the beginning of the trial the sole method claim was disclaimed and only the apparatus claims are in issue here.

Plaintiff, Marvel Specialty Company, Inc., has been the owner of the Brown patent since its issuance. Defendant, Bell Hosiery Mills, Inc., is accused of infringing the Brown patent by its use of two types of mending machines purchased from Stanford Marley Distributing Company, Inc., of New York City. The latter company has conducted the defense of this action.

The accused devices, like the patented machine, are designed to repair pulled threads in knitted fabrics. Knitted fabrics normally are composed of one long strand of a single thread which is tied in a series of interlocking loops by the formation of slip knots. In knitted wear such as women's hosiery, these loops are formed in equal size and in parallel rows. A "pulled thread" in knitted fabric results when one of the loops so formed is snagged and becomes greatly enlarged thus reducing the size of a number of adjacent loops in the same row and drawing closer together the two parallel rows of loops on each side of the row containing the pulled thread. The loops so reduced produce a clearly definable line in the plane of the fabric which, together with the conspicuous pulled loop, readily detracts from the fabric's appearance and renders it defective. The salability of an article containing a pulled thread is substantially impaired and unless the thread is repaired the article must be discarded or sold as second quality. In the manufacture of light weight knitted wear, particularly sheer articles such as ladies' hosiery, the pulling of a thread may very easily occur even when the article is handled by a skilled operator exercising all reasonable care.

Prior to the invention of the machine which is the subject matter of the Brown patent, the correction of pulled threads presented a serious problem to the hosiery manufacturing industry. Correcting pulled threads was costly and time consuming and resulted in limited production in many knitting mills. The loops were repaired principally by the use of a hand tool consisting of a single needle mounted in an appropriate handle. A hand-tool device of this type is the subject of the Hutchison patent,[1] and will be referred to as the Hutchison device or hand tool. Pulled loops were repaired by the use of the Hutchison device in the following manner: That portion of the fabric containing the pulled and reduced loops was placed under light tension over the opening of a hollow mending cup thus causing the thread from the pulled loop to move back into the plane of the fabric and to produce a hole bounded on each side by reduced loops. The operator then manipulated the needle in a stroking fashion, beginning at the area of the pulled thread and moving along the series of abnormally small loops on one side of the hole. On each stroke the needle contacted a plural-

1. United States patent No. 2,493,876 issued to R. D. Hutchison January 10, 1950.

ity of loops. This stroking action had the effect of withdrawing thread from the enlarged loop and restoring it to the reduced loops, thus eventually returning all of the loops to their normal size.

### The Patented Machine

The plaintiff's patented commercial machine is called the "Marvel" machine. It is adapted to perform the same function accomplished by the Hutchison device, i. e., the restoration of pulled and reduced loops in knitted fabric to their normal size. Essentially, the machine consists of a spindle, adapted to be rotated about its longitudinal axis, mounted in a handle, with a hub, on which a circular series of work engaging elements are mounted, affixed to the spindle and rotatable therewith. The work engaging elements of the Marvel machine are twelve flexible needles which extend radially from the hub so that their outer ends define a circle and are sloped rearwardly or away from the point of impact to avoid snagging or tearing the fabric. Although no definite thickness is specified in the patent, the ends of the work engaging elements must have a thickness which is less than the width of a course of the fabric. Plaintiff's commercial machine is driven by an electric motor at a speed which causes the impacting elements to strike the fabric at a rate of approximately 4800 blows per minute. The flexible elements travel in a circular path with each needle striking and sliding over a plurality of loops.

The mending elements, exclusive of power source, of all of the machines are small enough to be easily held in the hand of an operator.

### The Miracle Type Machine

One of the machines purchased from the Stanford Marley Distributing Company was the machine referred to throughout the trial as the Miracle type device [2] which very closely approximates the plaintiff's commercial machine. The only significant difference between the two is in the nature of the impact or work engaging elements. Unlike the flexible, needlelike members of the Marvel, the impact elements of the Miracle machine are rigid projections shaped like the teeth of a saw. The speed of the Miracle machine may be varied and it is capable of operating at much higher speeds than the Marvel machine. Defendant concedes that claim I of the Brown patent literally comprehends the Miracle machine.

### The Miracle Type Machine

■■ The differences between plaintiff's commercial machine and the Mend-More machine, the second accused device, are more fundamental. It was stipulated at trial that Mayer patent No. 2,819,598 describes the relevant parts of the accused Mend-More machine.[3] Basically, the Mend-More, like the Marvel, comprises a spindle adapted to be rotated about its longitudinal axis, with a hub, on which the work engaging element is

2. "Miracle" was the brand name of a machine embodying the same structure as the accused device. It has been used to designate the saw-tooth type machine.

3. United States patent No. 2,819,598 was issued to H. G. Mayer on January 14, 1958. The accused Mend-More machine is made by Stanford Marley Distributing Company, Inc., under a license from Mayer. The Mayer patent specification itself states that it is an improvement on the Marvel device. It should be noted that the making of patentable improvements does not avoid infringement. Ackermans v. General Motors Corp., 202 F.2d 642 (4 Cir.), cert. denied, 345 U.S. 996, 73 S.Ct. 1139, 97 L.Ed. 1403 (1953); Wine Ry. Appliance Co. v. Baltimore &

O. R. Co., 78 F.2d 312 (4 Cir. 1935); Waterproof Insulation Corp. v. Insulating Con. Corp., 153 F.Supp. 626 (D.Md. 1957). As stated in Wine Ry. Appliance Co. v. Baltimore & O. R. Co., supra, 78 F.2d at 316: "Patentable difference does not of itself tend to negative infringement. It may just as well be based upon infringement, plus improvement; and improvement may lie in addition; simplification, or variance."

Where an improvement patent comprehends an earlier patent, neither of the two patentees can lawfully use the invention of the other without the other's consent. Cantrell v. Wallick, 117 U.S. 689, 694, 6 S.Ct. 970, 29 L.Ed. 1017 (1886).

mounted, fixed on the spindle and rotatable therewith. Unlike the Marvel, however, the Mend-More machine has a single work engaging element which is a rigid, elongated blade. This blade is eccentrically mounted on the hub and pivotally attached to the handle in such a manner that rotation of the hub, upon the communication of power from the motor, causes the blade to move in an elliptical or curvilinear path. The lower portion of the movement of the Mend-More blade is substantially the arc of a circle so that the *path* of the blade in the area in which the blade engages the fabric closely approximates the *path* of the impacting elements of the Marvel and Miracle machines. The working end of the Mend-More blade is V-shaped, its impacting edge being sloped rearwardly or away from the fabric. The Mend-More machine, unlike the Miracle machine, is not comprehended by the literal language of the Brown patent claims.

## Procedural History of This Action

Before passing on to a consideration of the issues of validity and infringement, we review briefly the procedural history of this action. The complaint was filed in August of 1959. The defendant answered in February of 1960, admitting that the Brown patent was valid and infringed by the Miracle machine but denying that the Mend-More machine infringed. In March of 1960 the defendant filed an amended answer in which it deleted the confession of judgment with respect to the Miracle machine, and in September filed a further amended answer denying the validity of the Brown patent. Prior to the trial the plaintiff specified claims 1, 2, 4, 7, and 10 as those on which it would rely. At the opening of the trial, however, plaintiff disclaimed claim 10,[4] the only method claim involved. The reason given for the disclaimer was that plaintiff had just discovered that the claim was misdescriptive of the method actually employed in the correction of pulled loops. Method claim 10 was concededly misdescriptive of the actual method employed in two respects. First, claim 10 described a method of striking a single loop a series of blows before the next loop was contacted. As previously stated, the Marvel device actually strikes a plurality of loops upon each movement of an impacting element across the fabric. Indeed, the operation described in claim 10 with reference to striking a single loop is impossible to perform. Secondly, claim 10 stated that the above procedure was continued until all of the loops on one side of the center hole had been returned to their normal size before repair of the other side was begun. Actually, however, when the patented device is employed, some of the loops on the side first acted upon are enlarged beyond their normal size and are not returned to nor-

4. A formal disclaimer was filed in the patent office immediately after the trial. Method claim 10 is set forth below:
"10. The method of restoring to original condition a distorted course of a knitted fabric one loop of which has become enlarged by the incorporation therein of material withdrawn from adjacent loops which have for this reason been reduced, comprising, placing an area of the fabric which includes the enlarged and reduced loops under light tension and, while maintaining the fabric under tension, withdrawing material from the enlarged loop and adding it to the reduced loops until all are restored substantially to normal size, by striking a distorted loop located closely adjacent the enlarged loop a series of relatively light rapidly repeated blows applied in a direction longitudinally of the distorted course and away from the enlarged loop by impact members the effective widths of the work engaging surfaces of which do not exceed the width of a normal course of the fabric, thereafter similarly applying a series of similarly directed relatively light and rapidly repeated blows in succession to those remaining distorted loops of the course which are located upon the same side of the enlarged loop as the loop first engaged and thereby restoring to normal size all distorted loops of the course upon that side of the enlarged loop and reducing the enlarged loop, and thereafter similarly acting upon in succession the distorted loops of that portion of the distorted course which are disposed upon the opposite side of the enlarged loop."

mal until the other side is repaired. It was the discovery of this latter phenomenon which allegedly caused the plaintiff to disclaim the method claim.

During the course of the trial, the defendant asked leave to amend its answer, pursuant to Rule 15(b) of the Federal Rules of Civil Procedure, to allege misuse of the Brown patent because of the inclusion of allegedly unlawful restrictive covenants in certain lease agreements covering the Marvel machine, and to allege that the patent was unenforceable because the plaintiff knew or should have known for some years that the method claim was invalid. The court granted leave to amend.

■ The District Court held that the Brown patent was valid and that the Miracle machine infringed but the Mend-More machine did not infringe. Collaterally, the court held that plaintiff was not guilty of misuse so as to bar enforcement of the patent. Each party has appealed from the rulings adverse to it.[5]

*Validity*

■ We believe that the District Court was plainly correct in holding the Brown patent valid. The basic requirements for patentability are set forth in 35 U.S.C.A. §§ 102 and 103.[6] Section 102 contains the requirement of novelty and says, in essence, that an invention is not patentable if it was previously known or used by others in this country, or patented or described in a printed publication in this or a foreign country. Section 103 adds to the requirement of novelty that of invention. It provides that an invention to be patentable must differ from the prior art in such a manner that the subject matter as a whole would not have been obvious at the time of the invention to a person having ordinary skill in the art.

There can be no question of the novelty of Brown's invention. As pointed out by the District Court, there was no patent literature on machines for mending pulled threads prior to the Brown invention. Except for the Hutchison hand tool, there were no machines in existence which could be used to repair pulled threads in knitted fabric. The prior art cited by the Patent Office ranges from auto wheels to rug beaters and certainly does not demonstrate lack of novelty in Brown's invention. A more closely related invention is the German patent cited by the defendant in the District Court.[7] This patent, however, relates to an apparatus for smoothing woven fabrics and could not be used to correct pulled threads in knitted fabric. It clearly does not anticipate the Brown invention so as to negate novelty under section 102. The only real question as to the validity of the patent is not one of novelty or prior use but one of invention.

The extent to which the enactment of section 103 of the statute altered prior law is not altogether clear. See Berry Brothers Corporation v. Sigmon, 317 F.

5. On this appeal the defendant has not argued the question of misuse in its brief. Pursuant to this court's Rule 10, par. 8, the point "will be deemed abandoned."

6. 35 U.S.C.A. § 102 (1958) provides in pertinent part:

"A person shall be entitled to a patent unless—

"(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

"(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, * * *"

35 U.S.C.A. § 103 (1958) provides:

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

7. German, Ruizand Patent No. 23,334, issued January 9, 1883.

2d 700, 704 (4 Cir. 1963); Triumph Hosiery Mills, Inc. v. Alamance Industries, Inc., 299 F.2d 793, 800 (4 Cir.), cert. denied, 370 U.S. 924, 82 S.Ct. 1566, 8 L.Ed.2d 504 (1962). It is apparent, however, that something less than a "flash of genius" or "inventive genius" may fulfill the mandate of the statute. Berry Brothers Corporation v. Sigmon, supra; Reiner v. I. Leon Co., 285 F.2d 501 (2 Cir. 1960) (L. Hand), cert. denied, 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961). A number of cases, both before and after enactment of the statute, have undertaken to comprehensively set forth the standard of invention to be used as a test for determining patent validity. When the mass of verbiage has been distilled, however, we have little more to guide us than the test which is incorporated in section 103, that is, whether, in view of the prior art, the subject matter of the patent would have been obvious at the time of the invention to a person having ordinary skill in the art.

Of course, any determination of obviousness requires analysis of the extent to which the prior art had developed. As previously stated, the only prior art device used to repair pulled threads was the Hutchison device which accomplished the same result as the patented machine, *i. e.*, the restoration of pulled threads in knitted fabric. In a sense, it achieved the result in the same manner by striking the reduced loops a plurality of blows and withdrawing thread from the enlarged loop. But, as the District Court found, the patented machine operates in a fundamentally different manner from the Hutchison device. "The rotation of the Brown spindle and hub is not the same operation as the stroking hand operation." And, of course, the differences in structure are great. There is no question that the patented machine represented a great advance in the art of correcting pulled threads in knitted fabrics. We think it clear that mere familiarity with the teachings of the Hutchison patent would not suggest the advance made by Brown. But defendant contends that

knowledge of patents and machines from other arts would, when considered in the light of Hutchison, render the Brown invention obvious. Principal reliance is placed by the defendant upon the German Ruizand patent (No. 23,334) and the United States Woodhead patent (No. 2,-084,367).

Both the Ruizand and Woodhead patents relate to machines designed to operate on woven fabrics. Ruizand discloses a circular series of self-sustaining impact members which operate to straighten or smooth the threads of woven fabric as the cloth is moved beneath the impacting members. The impacting members are attached to hubs or discs which are mounted on a shaft next to a grooved pulley. A rope belt passing through the pulley rotates the hubs causing the impact members to engage the work. In operation, the hubs rotate in a fixed position and a bolt of cloth supported at one end is led beneath the rotating discs and taken up at the other end. As the cloth passes under the rotating wheels which are spaced a short distance apart across the fabric, the circularly mounted blades beat the fabric, broadening and smoothing the threads. The impacting elements of the Ruizand machine are elongated blades having a diameter of between two and three feet and a radius at the ends of approximately one inch. The machine is approximately six feet square.

The Woodhead patent relates to an apparatus for preshrinking woven cloth. Its relevant disclosure concerns an assemblage of closely positioned, thin, saw-toothed discs upon a shaft or axis. The discs, or blades, are adapted to engage a strip of cloth as it is moved along an apron beneath them. The blades, which are rotated in the same direction that the cloth is moving, penetrate the fabric and move the weft threads closer together. The patent states that the teeth of the discs "are preferably relatively fine, pointed at their ends, beveled on the sides and slightly undercut to permit ready penetration of the cloth web and yarn components * * * without in-

jury or tearing upon entry and withdrawal." Like the blades in Ruizand, the discs described in the Woodhead patent are very large, probably a foot in diameter. The teeth of the discs are sloped toward the point of impact with the fabric or in the opposite direction from the slope of the impacting elements of the Marvel machine. Since the teeth actually penetrate the fabric, the speed of the discs relative to the speed of the cloth must be very slow to avoid tearing the fabric.

It is apparent that the Ruizand and Woodhead machines differ greatly, in both structure and operation, from the Marvel machine. Both are designed to operate on woven cloth quite dissimilar in composition to knitted fabric. Neither could be modified to correct pulled threads in knitted wear.[8] Other prior art citations are even less apposite.

█ Analysis of the prior art citations discloses that each of the elements of the Brown invention is old, but that fact does not defeat patentability. As stated by Judge Learned Hand in Reiner v. I. Leon Co., 285 F.2d 501, 503 (2 Cir. 1960):

"* * * It is idle to say that combinations of old elements cannot be inventions; substantially every invention is for such a 'combination': that is to say, it consists of former elements in a new assemblage. All the constituents may be old, if their new concourse would not 'have been obvious at the time the invention was made to a person having ordinary skill in the art' * * *."

█ Accord, Duo-Flex Corporation v. Building Service Company, 322 F.2d 94

(5 Cir. 1963). And, as this court has stated, the validity of a patent combining old elements "depends upon whether these elements have been put together in such a manner, not obvious to a person skilled in the art, as to produce a new and better result * * *." O. M. I. Corporation of America v. Kelsh Instrument Co., 279 F.2d 579, 582 (4 Cir. 1960); see Entron of Maryland, Inc. v. Jerrold Electronics Corp., 295 F.2d 670 (4 Cir. 1961); Colgate-Palmolive Company v. Carter Products, 230 F.2d 855 (4 Cir.), cert. denied, 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956); American Chain & Cable Co. v. Rochester Ropes, 199 F.2d 325 (4 Cir. 1952). Although the Hutchison hand tool could be used to repair pulled threads, the patented Marvel machine manifestly achieves a new and better result within the meaning of the above-quoted language.

The very significant differences between the Ruizand and Woodhead machines and the patented Marvel machine, in terms of function and manner of operation, militate against a determination that the Brown invention would have been obvious to a person of ordinary skill in the art. Such a determination would be particularly difficult in view of the great disparity in composition between knitted fabric and the woven material on which the Ruizand and Woodhead machines were designed to operate.

Defendant emphasizes the testimony of its expert, Robert H. Lawson,[9] that the prior art could teach one interested in the repair of pulled threads to construct a suitable apparatus. A sufficient rejoinder is the statement of Justice McKenna in Diamond Rubber Co. of New York v. Consol. Rubber Tire Co., 220 U.

8. Of course, even if the machine could be modified to work on knitted fabric that fact would not defeat patentability unless modification would have been suggested to a person of ordinary skill in the art. See Duo-Flex Corporation v. Building Service Company, 322 F.2d 94, 96 (5 Cir. 1963).

9. It should be noted that Mr. Lawson did not testify that the Brown invention would have been obvious to a person of ordinary skill in the art. His testimony was to the effect that inventions had been suggested to him by prior art which was further removed than the German patent. Mr. Lawson was, perhaps, a person of greater than ordinary skill, having himself secured more than 200 patents.

172

S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911):

" * * * Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. * * * "

The difficulty of determining subjectively at some removed time whether a particular invention would have been obvious to a person of ordinary skill in the art has caused this court, as well as others, to seek objective criteria of obviousness. See e. g., Honolulu Oil Corporation v. Shelby Poultry Company, 293 F.2d 127, 130–131 (4 Cir. 1961); Reiner v. I. Leon Co., 285 F.2d 501, 503–504 (2 Cir. 1960). Resort to the objective indicia in the record of this case amply supports the District Court's determination of validity.

■ Prior to the Brown invention, the correction of pulled threads represented a serious problem of long duration in the knitting industry. Prior art tools and methods were inadequate to cope with the problem. Use of the Hutchison hand tool was costly and time-consuming. It resulted in reduced production in many mills. Yet, no one came forward with a better means of correcting pulled threads. When the Brown invention was disclosed it was immediately accepted by the industry as the solution to the problem. Within three and a half months after the first attempt to lease a

machine embodying the Brown patent, every major hosiery mill in the United States had taken a lease. Within eight months approximately 635 mills, comprising 90 per cent of the industry, had accepted leases. The commercial success achieved by the machine was indeed remarkable and it was accomplished with very little advertising. While commercial success cannot lend validity to a patent where invention is clearly wanting, this court has consistently recognized that it is a relevant factor which may be convincing in a close case. See, e. g., Power Curbers, Inc. v. E. D. Etnyre & Co., 298 F.2d 484 (4 Cir. 1962); S. H. Kress & Company v. Aghnides, 246 F.2d 718 (4 Cir.), cert. denied, 355 U.S. 889, 78 S.Ct. 261, 2 L.Ed.2d 189 (1957); Hutzler Bros. Co. v. Sales Affiliates, 164 F.2d 260 (4 Cir. 1947). In addition, the disclosures of the Brown patent resulted in a great benefit to the hosiery industry. The cost of mending was reduced from an average of seventy cents to twenty-five cents per dozen hose. At the same time, the earnings of menders were increased and the mending of long pulls made practicable. As pointed out by the District Court, the correction of pulled threads was changed from a tedious hand operation to a mass production machine operation.

In view of the apparent need which so long had persisted, the obvious benefits to be gained by both the inventor and the industry from meeting the need, and the failure of anyone to meet it, we think the finding of patentable invention can be sustained even without considering the statutory presumption of validity.[10]

■ Defendant predicates a further attack on the patent's validity upon an alleged failure to comply with 35 U.S.C.A. section 112. Section 112[11] pro-

10. 35 U.S.C.A. § 282 (1958) provides that "[a] patent shall be presumed valid. The burden of establishing invalidity of a patent shall rest on a party asserting it." Defendant has argued that this presumption is weakened or destroyed by the failure of the plaintiff to disclose to the Patent Office the fact that the width

of the Hutchison needle was less than a normal course of the fabric on which it was used. Even if defendant's contention is correct, which we do not decide, it would not change our view of the case.

11. Section 112 provides in pertinent part: "The specification shall contain a written description of the invention, and of

vides that the patent specification shall contain a description of the invention and of the manner of making and using it. It is undisputed that the patent adequately discloses how to make the machine. Defendant contends, however, that since the specification is phrased in terms of the concededly erroneous method claim 10, it does not disclose how the machine is actually used. In other words, defendant asserts that the specifications teach an operator to strike one loop a plurality of blows before contacting the next loop. In fact, when the machine is used a plurality of loops are contacted upon the movement of a single impact member across the fabric; therefore, defendant asserts, the specifications are fatally defective in that the operator is told to strike one loop when, in fact, he must strike a number of loops. This contention is without merit. It is not necessary, to sustain the validity of an apparatus claim, that an inventor understand or be able to articulate the scientific principles underlying his invention.[12] The test of whether disclosure is adequate is an operational one. All the statute requires is that the patent disclose how to make and use the invention. We believe the Brown patent meets this requirement. The specifications teach an operator to place the fabric containing the pulled thread in slight tension over the opening of a mending cup. They then direct the operator to position the implement so that the tips of the work-engaging elements will successively engage the first collapsed loop on one side of the center hole. The operator is then told to draw the implement toward himself while maintaining the tips of the elements in the same plane so that they will continue to strike the loops and to repeat the operation if necessary. All of the information necessary to enable one skilled in the art to use the Brown invention is contained in the specification. The inaccurate description of delivering a plurality of blows to a single loop is not material and any difficulty due thereto is more theoretical than real. As the defendant has emphasized, any attempt to use the patented machine results in a plurality of loops being contacted. When a machine is used as directed in the specifications, except that instead of striking a single loop the impacting elements strike a number of loops, the pulled thread is repaired. This case differs markedly from those cases relied upon by defendant where an inadequate or erroneous disclosure resulted in actual inability to make or use the invention.[13] The Brown invention has been put into practice. The world has been given something new and taught to use it. Lever Bros. Co. v. Procter & Gamble Mfg. Co., 139 F.2d 633, 638 (4 Cir. 1943). We think the erroneous description relates much more directly to the method by which the invention operates than it does to how it is used. The sole method claim has been disclaimed and, since the specifications sufficiently explain how the machine is made and used, the apparatus claims are not affected.[14]

the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

"The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

12. Lever Bros. Co. v. Procter & Gamble Mfg. Co., 139 F.2d 633 (4 Cir. 1943); see Standard Coil Products Co. v. General Electric Company, 306 F.2d 319, 323 (2 Cir. 1962).

13. See, e. g., Standard Coil Products Co. v. General Electric Company (see footnote 12).

14. 35 U.S.C.A. § 253 (1958). In relevant part section 253 provides:

"Whenever, without any deceptive intention, a claim of a patent is invalid the remaining claims shall not thereby be rendered invalid. A patentee * * * may, on payment of the fee required by law, make disclaimer of any complete claim * * *."

### Infringement by Miracle

Certainly the most difficult question to resolve is that of infringement. As previously stated, the District Court held that the Miracle type machine infringed the patented invention while the Mend-More machine did not. We think the court's conclusion with respect to the Miracle machine is plainly correct. Claim 1 of the Brown patent, stipulated as representative of the apparatus claims in issue, reads as follows:

"1. Apparatus for restoring to original condition a knitted fabric one loop of which has become enlarged and adjacent loops reduced, comprising, in combination, a spindle adapted to be rotated about its longitudinal axis, a hub fixed upon the spindle and rotatable therewith, and a circular series of self sustaining work engaging elements mounted upon said hub, said elements being adapted to successively engage the work when the hub is rotated, the work engaging surfaces of said elements at the outer ends thereof facing forwardly and outwardly and being smooth and no wider than a normal course of the fabric to be restored."

It is undisputed that claim 1, considered by itself, literally comprehends the Miracle machine. Defendant's sole contention with respect to infringement by the Miracle machine seems to be that when claim 1 is read in the context of the specifications it must be construed as claiming only an apparatus which delivers a number of blows to a single loop. Were we to adopt defendant's argument, we would indeed be engaging in circuitous reasoning. Such a construction of claim 1 clearly would render it invalid as describing an invention which is impossible to construct and use. It is true, as defendant asserts, that patent claims should be interpreted in light of the specifications. See, e. g., Wheeling Stamping Co. v. Standard Cap & Molding Co., 155 F.2d 6 (4 Cir.), cert. denied, 329 U.S. 764, 67 S.Ct. 125, 91 L.Ed. 658 (1946). Here, however, we cannot assign such significance to the erroneous portion of the specifications. Apparently, Brown originally misconceived the method by which his invention operated but there is nothing in either the specifications or the claims to suggest that the latter are limited to machines which operate to deliver a plurality of blows to one loop before contacting another. Claim 1 should be interpreted in accordance with its plain meaning. See Cameron Iron Works v. Stekoll, 242 F.2d 17 (5 Cir. 1957). So construed, it comprehends the Miracle type machine. Therefore, use of the Miracle infringes the Brown invention.

### Infringement by Mend-More

Resolution of the question, whether the Mend-More machine infringes the Brown invention, is more difficult. Moreover, both parties have recognized this question as the crucial issue. It is the Mend-More machine which the defendant has principally used and it is that machine which Stanford Marley Distributing Co., Inc., would like to sell.

As previously stated, the Mend-More machine is not literally covered by the Brown patent claims. Therefore, the resolution of the question of infringement depends upon whether the Mend-More machine is equivalent to the patented machine under the doctrine of Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The reasoning of the District Court in holding that the Mend-More machine did not infringe the Brown patent is revealed in the following excerpt from its opinion:

"\* \* \* Instead of a plurality of work engaging needles, the Mend-More device employs a single blade mounted eccentrically on a hub. The rotation of the hub is increased some ten times as compared to the Brown device, thereby getting approximately the same number of strokes or blows per minute against the fabric. The action on the fabric is closely similar, but the stroke is slightly flatter and more closely ap-

proximates the Hutchison device movement than does the Brown device. Except for the Hutchison prior art, the Graver Tank doctrine of equivalents ought perhaps to be applied to the Mend-More device, but, in view of Hutchison, the broad construction urged by plaintiff for the Brown patent cannot be allowed. To apply the doctrine of equivalents in this case would ignore the teachings of the patent, the representations upon which the claims in suit were allowed, and the representations by which the validity of the Brown patent has been sustained in the prior portion of this opinion. * * * It would be contrary to the teachings of the Brown patent and its file history to say that a single blade is the equivalent of a series of circular arranged flexible needles. Although function and result are the same, the two devices do not operate in the same way. This is emphasized by Brown's claim of novelty over the Hutchison single needle device: the circular arrangement of plural needles. Brown narrowed his claims in order to get his patent issued over Hutchison. He should not now be permitted to get through the doctrine of equivalents what he could not have obtained initially. * * * "

■ The plaintiff's position, essentially, is that although the District Court's basic factual findings were correct, it drew erroneous conclusions therefrom. We are inclined to agree. A protection which extended only to those devices which exactly copy the patented invention would be a hollow and useless safeguard. The essence of the doctrine of equivalents is that one may not pirate another's patent. The test enunciated in the Graver Tank case for determining equivalency is whether the accused device "performs substantially the same function in substantially the same way to obtain the same result." The Supreme Court pointed out that the theory upon which the doctrine of equivalency is founded "is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.' " [15]

The portion of the District Court's opinion previously quoted indicates that the court was satisfied that the Mend-More met the Graver Tank test of equivalency but felt precluded, by its view of the effect of the prior art Hutchison device and plaintiff's representations with respect thereto, from giving the Brown patent a scope which would include the Mend-More machine. Temporarily putting aside consideration of the effect of the Hutchison patent, it seems clear that the doctrine of equivalents should be applied to the Mend-More machine.

The elements of the Brown invention as set forth in claim 1 include: (1) A spindle adapted to be rotated about its longitudinal axis; (2) a hub fixed upon the spindle and rotatable therewith; and (3) a circular series of self-sustaining work-engaging elements mounted upon the hub. It is apparent that all of the elements of claim 1 except the last are embodied in the Mend-More machine. Instead of a circular series of work-engaging members, the Mend-More uses a single blade. The question for resolution, then, is whether the single blade of the Mend-More is the equivalent of the circular series of impacting members of the Marvel. And this, of course, depends upon whether the two machines perform substantially the same function in substantially the same way to obtain the same result.

In holding the Mend-More machine not to infringe, the District Court was, we believe, unduly influenced by merely formal differences in structure which would not preclude the accused infringer from utilizing the full advantages of the

15. 339 U.S. at 608, 70 S.Ct. at 856, 94 L. Ed. 1097.

Brown invention.[16] The Mend-More machine unquestionably accomplishes the same result as the patented machine. It performs the same function. We believe it performs that function in substantially the same way.

In operation, the single blade of the Mend-More is so positioned as to engage the first distorted loop on one side of the center hole. It operates to correct the pulled thread, in the same manner as the Marvel, by delivering repeated light blows to the reduced loops and thereby withdrawing the excess thread from the enlarged loop. Like the impacting elements of the Marvel, the leading edge of the Mend-More blade is sloped rearwardly to avoid snagging and tearing the fabric. Thus, in operation the impacting elements of both machines strike and slide over the distorted loops. Significantly, the working element of the Mend-More, like that of the Marvel, engages the fabric through the action of a combination of a rotating spindle and hub. Moreover, the speed of the hub's rotation is increased some ten times so that the single blade of the Mend-More delivers approximately the same number of blows to the fabric per minute as the twelve work-engaging members of the Marvel.

Defendant has emphasized the fact that the working element of the Mend-More travels in an elliptical or curvilinear path, whereas the path of the Marvel needles is circular. However, we do not think the movement of the blade *outside of the working area* is important.[17] In the working area[18] the Mend-More blade travels in a path, substantially the arc of a circle. It is the path of travel in this area which is significant because it determines how the impact element will engage and act upon the fabric. Since the impact elements of both the Marvel and Mend-More ma-

chines travel in substantially the same path through the working area, the action of the elements of each machine on the fabric is, as the District Court found, "closely similar." Additionally, it should be noted that the movement achieved in the Mend-More by the eccentric connection of the blade to the hub is an old and well known mechanical movement which could be readily adapted to produce the action upon the fabric achieved by the Marvel machine.

In the Graver Tank case, the Supreme Court emphasized that in determining equivalence "[c]onsideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was."[19] In the circumstances here, we are convinced that the single blade of the Mend-More is in fact the fair equivalent of the circular series of work-engaging elements claimed in the patent.

Of course, equivalency in patent law cannot be determined in vacuo. The question of infringement must be considered in the context of the prior art and with an eye to the contribution made by the patented invention. As previously stated, the District Court felt that the prior art Hutchison device precluded its giving a scope to the invention which would cover the single blade Mend-More. The court emphasized that to apply the doctrine of equivalents to the single blade device would ignore the basis upon which it had sustained the patent's validity, and stated: "The claims of the Brown patent 7, 4, 2 and 1 fail to cover the Mend-More device by the very same

16. See Duo-Flex Corporation v. Building Service Company, supra, 32 F.2d at 99. (See footnote 8.)

17. Cf. Keiser v. High Point Hardware Company, 199 F.Supp. 623 (M.D.N.C. 1961), rev'd on other grounds, 311 F.2d 850 (4 Cir. 1962).

18. The "working area" includes the area immediately preceding and following the blade's contact with the fabric.

19. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 609, 70 S. Ct. 854, 857, 94 L.Ed. 1097 (1950).

point or points of novelty that distinguish the claims over Hutchison." In this determination we are of the opinion that the District Court was in error. The Brown invention, completely aside from the circular arrangement of the work-engaging elements, is clearly distinguishable from the Hutchison device. The Brown invention, like the Mend-More, involves a combination of elements. The Hutchison device comprises a single element. Mending by both the Brown and Mend-More machines involves the combined action of a spindle and hub which is different from the stroking hand operation. The District Court, in the portion of its opinion dealing with validity, recognized these differences. It distinguished the spindle used in the Brown invention from the handle of the Hutchison device. The court then went on to point out that the two devices operate in a different manner: "But the actual operation of Brown and Hutchison are different—and not simply in the means for rotating the hub, which is not claimed by Brown. The rotation of the Brown spindle and hub is not the same operation as the stroking hand operation. The work is done in a different way, although the impacting element(s) strike(s) the fabric similarly, with the same result." It was on the basis of the above differences, *common to both Marvel and Mend-More,* rather than the circular arrangement of a series of elements, that the District Court properly distinguished the Brown invention from the prior art Hutchison device. Clearly the Brown invention more closely approximates the Mend-More machine than it does the prior art hand tool. The Hutchison patent does not preclude a scope for the Brown patent which would cover the Mend-More

machine. Such a narrow construction of the Brown patent would be particularly incongruous in view of the very significant contribution to the art made by the invention.

The art to which the Brown invention relates is not a crowded one. The invention is more than a narrow improvement to a complex machine, protection for which should be strictly limited to secure for the public that which it previously had. On the contrary, Brown has ushered in a new art, prompting others to emulate as well as to improve upon his invention. The Brown invention relates to the first machine ever devised which employs a combination of elements to correct pulled threads in knitted wear. As such, it is entitled to protection broad enough to cover the Mend-More machine.[20]

In conclusion, we have carefully reviewed the file wrapper of the Brown patent to determine if there is any representation therein which should estop the plaintiff from claiming that the Mend-More infringes its invention.[21] We have found none. The Hutchison device was not cited against any of the apparatus claims of the Brown patent. No representations based upon the circular series of impacting elements were made to distinguish the Brown invention from the Hutchison device. Plaintiff did attempt to distinguish its method claim from the Hutchison patent by pointing out that the impacting members of its invention delivered a series of blows to one loop before acting upon another. However, as previously pointed out, the method claim was disclaimed and there is no reason to suppose that the apparatus claims were granted because of the erroneous representations with

20. See Specialty Equipment & Mach. Corp. v. Zell Motor Car Co., 193 F.2d 515 (4 Cir. 1952); Saco-Lowell Shops v. Reynolds, 141 F.2d 587 (4 Cir. 1944).

21. In its opinion, the District Court indicated that plaintiff had secured the issuance of its patent by representing to the Patent Office that its invention was different from the Hutchison device because of the circular arrangement of plural needles. On appeal, the defendant has not attempted to defend that position but has argued instead that plaintiff secured the patent by erroneous representations as to the method by which its invention operated.

respect to method.[22] We reach the conclusion that in law, as well as in fact, the Mend-More device is the equivalent of the Brown invention and infringes.

Affirmed in part, reversed in part and remanded for appropriate proceedings.

---

22. Indeed, review of the file wrapper convinces us that the Examiner was fully aware of the rule that patentability of an apparatus claim cannot be predicated upon a new method.