HELTRA, INC., Plaintiff,

v.

RICHEN–GEMCO, INC., Defendant.

Civ. A. No. 73–439.

United States District Court,
D. South Carolina,
Greenville Division.

July 18, 1979.

Leo Hill, Ralph Bailey, Greenville, S. C., for plaintiff.

Charles Wofford, James W. Geriak, Robert M. Taylor, Jr., Los Angeles, Cal., James C. Parham, Jr., of Wyche, Burgess, Freeman & Parham, Greenville, S. C., William E. Thomson, Jr., John D. McConaghy, Los Angeles, Cal., Townsend Belser, Jr., Columbia, S. C., for defendant.

CHAPMAN, District Judge.

This matter is before the Court upon remand from the Fourth Circuit Court of Appeals, *Richen-Gemco, Inc. v. Heltra, Inc.*, 540 F.2d 1235 (1976). The trial court originally found for plaintiff Heltra primarily upon the basis that defendant was using the "basic concept" of plaintiff's machine (hereinafter the Tradewell machine) although defendant had made certain changes therein prior to beginning the sale of this type equipment. The machine being sold by defendant is referred to herein as the Richen machine.

These machines are used in the textile manufacturing industry for the processing of synthetic yarn. A more detailed history of the relationship and agreements between plaintiff and defendant is contained in this Court's Order of May 9, 1975, which found for the plaintiff on the issue of liability. A subsequent Order of August 15, 1975 found the amount of damages due plaintiff by defendant up to the date of that Order.

In the opinion of the Court of Appeals, authored by Chief Judge Markey of the United States Court of Customs and Patent Appeals, the trial court was directed to make certain findings:

The record reflects direct conflict in testimony on the operation and structure of Richen's machine product. Whether the air flow in the Richen machine is turbulent or laminar, whether the yarn is positioned centrally of the Richen conduit, and whether the Richen machine incorporates the claimed cooling and collecting means or their equivalents, are critical and controlling factual issues remaining open on the record before us. The initial resolution of those fact issues is the province of the trial court.

In the same opinion Judge Markey also stated:

The patent claim language thus limits and defines the precise mechanical structure on which royalties may be exacted under the contract. The manner of the operation of the machine purchased from Heltra, or the copies thereof made by Richen, is irrelevant to the issue in the case. That Richen's machine product may or may not utilize the "basic concept" of conveying yarn through a heated conduit by a flow of air is also irrelevant. Under the contract, royalties are not to be exacted on the sale of machines using treadwells "basic concept" but, rather, on sale of machines "covered by said patent application". The Richen machine product is not subject to royalty payments under the contract unless it incorporates, inter alia, the laminar flow and central yarn positioning of claims 1–8 *or* the cooling and collection means of claims 9–14. (Emphasis added)

Therefore, the basic issue now before this Court is whether the Richen machine is within the patent claim language of either claims 1–8 *or* 9–14 or their equivalents.

Additional testimony has been taken and additional exhibits introduced. These have been considered and weighed by the Court and the extensive briefs submitted by the parties have been studied. Now, in accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court makes the following

## FINDINGS OF FACT

1. The Tradewell patent was issued November 5, 1968 and is Patent No. 3408716. The first claim in said patent states:

1. In apparatus for processing yarn feed means, including a positive feed de-

vice, yarn take up means to take up yarn at a predetermined rate, heater means intermediate said feed and take up means to heat the yarn to a predetermined temperature, and means intermediate said heater and said take up to afford cooling of said yarn, the rate of feed of said feed means being correlated to the predetermined rate and the shrinkage of said yarn in said heater means to maintain the yarn in said heater means in a substantially tensionless state, the improvement wherein said heater means comprises a tubular conduit receiving said yarn, said conduit being disposed in a plurality of convolutions, and means to inject gaseous medium into said conduit adjacent the inlet thereof to cause said air to flow through said conduit concurrent with said yarn with laminar flow devoid of turbulence to thereby position said yarns centrally in said conduit during his travel through the convolutions out of contact with the side walls of said conduit, and means to heat said convolutions of the conduit to thereby impart radiant heat to said yarn traveling there through.

As noted by Judge Markey in footnote 1: Claims 2–8 depend upon and further define the subject matter of claim 1. Claims 9–14 recite structural elements to cool and to collect the treated yarn.

2. An anemometer is used to measure air flow, which is expressed in Reynolds numbers. Laminar flow, also referred to as streamline flow, is a smooth passage of air carrying a Reynolds number of not more than 2300. From Reynolds No. 2300 to 4000 the flow of air is considered transitional, and a Reynolds number of over 4000 is considered turbulent. A "secondary flow" develops in corners or in circles of a coil which stabilizes the laminar flow and increases the Reynolds number at which air flow becomes turbulent. The Reynolds number at which flow enters the transitional zone is referred to as the "critical" number.

3. Tests made upon the Richen machine established that all Reynolds numbers are well below the critical number and, therefore, air flow in the Richen machine is laminar.

4. The Tradewell patent does not refer to flow in Reynolds numbers, but refers to "laminar flow devoid of turbulence." The air flow characteristics of the Richen machine and the Tradewell patent machine are the same, since the flow within the convolutions of the Richen machine is "laminar flow devoid of turbulence", and said flow accomplishes all of the purposes described in the Tradewell patent.

5. The air flow results from the introduction or injection of preheated air at the inlet nozzle concurrent with the introduction of the yarn. This is described in the Tradewell patent at col. 5, lines 19 and 20: "In the present instance, the injector tube 51 is mounted in the inlet fitting 48 so as to cause the air to flow substantially axially through the conduit without swirling movement . . .." This is the same process as used on the Richen machine where the preheated air is introduced through one inlet or passageway while the yarn is entering another. The introduction of the yarn and the preheated air in the Tradewell patent and in the Richen machine are the same and the yarn flow path is also the same.

6. The yarn is introduced or positioned centrally in the conduit, which is very small. It is impossible to determine whether the yarn stays in the exact center in its journey through the convolutions and the testimony indicates that the yarn does touch the side walls of the conduit at certain times during the passage. However, the language of the Tradewell patent does not require that the yarn stay in the exact center through the entire passage, but indicates that it moves through the conduit by means of laminar flow of preheated air and receives its heat not from contacts with the side walls, but by radiation of heat from the side walls and the heat of the air within the conduit. The Tradewell specification, col. 3, line 70–75, states that centering the yarn is to effectively eliminate contact between the yarn

and the walls of the conduit. It does not say that contact is completely eliminated. Little or no heating of the yarn is accomplished by touching the side walls. The path of the yarn within the conduit, as described in the Tradewell patent, is the same as that accomplished in the Richen machine, which travels centrally in the conduit but at certain points within the course of its passage may touch a side wall.

7. Defendant's expert witness, Dr. Castro, compared the air flow characteristics and the yarn path of the Richen machine with the machine set forth in the Tradewell patent and admitted that both were the same.

8. In both machines the yarn is in a substantially tensionless state as it passes through and exits the machine.

9. The changes made in the Tradewell machine by defendant were covered in a patent application bearing the name of Kennedy. While there was a change in the entrance nozzle under the Kennedy patent, Dr. Castro testified that the characteristics of air flow produced were the same in the Kennedy nozzle and the Tradewell nozzle. The exit nozzle developed by defendant and covered by the Kennedy patent application would have no appreciable effect on the air flow characteristics within the convolutions or the yarn path referred to according to defendant's expert witness Smith, and said air flow characteristics and yarn path would be the same as the Tradewell claim.

10. The Kennedy patent application also states that the yarn passes through the conduit "substantially centrally thereof" and that the yarn does not come in contact with the wall of the tube. In late 1974, after the present suit was brought, amendments were filed to the Kennedy patent application stating that the yarn may contact the wall of the conduit, even though it is described as passing substantially centrally through the conduit.

11. Defendant has contended that a patent previously issued to Deering Milliken Corporation in the name of DeVore has each of the structural elements set forth in claims 1 and 2 of the Tradewell patent and represents prior art. In the DeVore machine the yarn is pulled rather than allowed to pass through the machine in a substantially tensionless state. The evidence also shows that the DeVore apparatus was never operated effectively.

12. The machine covered by claims 1 and 2 of the Tradewell patent does the same work in substantially the same way and accomplishes substantially the same result as the Richen machine.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the issues.

2. The Court of Appeals has returned this case since the trial court originally compared the Richen machine to the prototype machine it had purchased from Heltra, rather than comparing the Richen machine to the claims of the Tradewell patent. Judge Markey stated: "The Richen machine product is not subject to royalty payments under the contract unless it incorporates inter alia, the laminar flow and central yarn positioning of claims 1–8 *or* the cooling and collection means of claims 9–14." He later concludes that there are factual issues to be determined: "Whether the air flow in the Richen machine is turbulent or laminar, whether yarn is positioned centrally of the Richen conduit, and whether the Richen machine incorporates the claimed cooling and collecting means or their equivalents, are critical and controlling factual issues remaining open on the record before us. The initial resolution of those factual issues is the province of the trial court." This Court has now resolved the necessary factual issues and found that the Richen machine employs laminar air flow and that the yarn is positioned centrally of the conduit.

3. In footnote 2 to his opinion Judge Markey states:

Because the claims of the application and the patent are identical, the same subject matter is "covered" by either and the contract reference to an "application" is equally applicable to the patent which

16

issued thereon. This is a case of contract interpretation in which particular terms were employed to define a product on which payments, termed "royalties", are due. The parties' arguments respecting various considerations of patent law, patent licenses, patent misuse, anti-trust law, and the possible effect on the contract of a future declaration of patent invalidity, are therefore irrelevant to the precise issue before us and we express no opinion thereon.

■ 4. Whether the plaintiff is entitled to royalties would depend upon whether Richen, if it were not an assignee of the Tradewell patent, would be an infringer. In an action between a patent assignor and the assignee the patent is given a liberal construction, *Leader Plow Co. v. Bridgewater Plow Co.*, 237 F. 376 (4th Cir. 1916), and this liberal construction between assignor and assignee has been extended to equivalents, *Eastern Electric, Inc. v. Seeburg Corporation*, 310 F.Supp. 1126 (S.D.N.Y.1969).

■ The defendant in the present case, who is the assignee of a patent, is making every effort to put the plaintiff in a straight-jacket by urging the Court to use the most limited and restricted interpretation of the words and phrases contained in the Tradewell patent. Defendant insists that the yarn must travel in the geometric center of the conduit and never touch the sides and that the air flow always be laminar, when experts for both parties could not determine what actually happened inside the convolutions of the conduit as the yarn was being passed through. It is obvious from the testimony that the yarn did not stay in the geometric center of the conduit and that occasionally it touched the outside wall. However, the language in the Tradewell patent does not require that the yarn never touch with the wall or that it remain in the exact center throughout its passage. The important part is that as the yarn passes through the machine any touching of the side walls is unintentional and serves no useful purpose, since the yarn is heated by heat exchange with the preheated air and by radiation from the walls of the conduit.

The testimony showed that in other processes yarn was purposely heated by continuous contact with a heated surface, and the language of the patent clearly shows that this was not the intent or purpose of the Tradewell apparatus.

■ 5. As to the laminar flow, there is no question that this condition exists in both the Tradewell patent and the Richen machine, since proper measurements of the air flow by Reynolds number show that the air flow was laminar and devoid of turbulence in the apparatus covered by the Tradewell patent and the Richen machine. Often it is impossible for a patentee to know precisely what happens in parts of a machine that cannot be visually observed. There is no need to speculate on the exact air flow or path of yarn in the present case. It is sufficient that the patentee draft his claims only as precisely as the subject matter permits. *Georgia-Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124 (2nd Cir. 1958), cert. den'd 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958). Richen-Gemco may not raise objections based on hypothetical uncertainties of what it thinks may occur in the air flow and the path of the yarn as it passes through the tube. This problem is well described in *Aerosole Research Co. v. Scovill Mfg. Co.*, 137 U.S.P.Q. 701 (N.D.Ill.1963), modified on other grounds 334 F.2d 751 (7th Cir. 1964) which stated in part:

This language is essentially language expressing theory of operation and does not place such a strict limitation on the scope of the claims that infringement may be avoided if a strict interpretation of the theory is not followed. The precise theory itself need not be evolved in detail here, since defendant's valve in fact does satisfy the terms of the claims insofar as the dimensional relations are concerned between the groove size and the gasket.

\* \* \* \* \* \*

None of the experts knew in fact whether the inner edge of the gasket actually moved into the groove, since no one had actually seen the internal relationships of the various parts of the valve while the

valve was being pressure filled. They did not know that while the valve was being pressure filled the gasket was deflected downward and the valve body and stem were moved downwardly.

\* \* \* \* \* \*

The description of the pressure filling method in the specification of the patent and illustrated in the drawings is a matter of theory and the claims are not limited thereto. A mistake in theory and functionality of structure recited in the specification or in the claims is not fatal to the validity of the claims.

In *Katz v. Horni Signal Mfg. Corp.*, 145 F.2d 961 (2nd Cir. 1944) the Court held that it was immaterial whether the patentee correctly understood exactly how his device operated.

Even using a literal interpretation of claims 1 and 2 of the Tradewell patent, it is obvious that the Richen machine uses and infringes these claims. However, the doctrine of equivalents, which has been applied in the Fourth Circuit, *Marvel Specialty Co., Inc. v. Bell Hosiery Mills, Inc.*, 330 F.2d 164 (1964), seals the defendant's fate. The leading case outlining the doctrine of equivalents is *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). Mr. Justice Jackson, speaking for the court, explained the purpose and application of the doctrine of equivalents as follows:

> In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.
>
> But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of the law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.
>
> The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of *Winans v. Denmead* (U.S.) 15 How. 330, 14 L.Ed. 717, it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. "To temper unsparing logic and prevent an infringer from stealing the benefit of the invention" a patentee may invoke this doctrine to proceed against the producer of a device "if it performs substantially the same function in substantially the same way to obtain the same result. *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42, 50 S.Ct. 9, 74 L.Ed. 147, 156. The theory on which it is founded is that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape."

\* \* \* \* \* \*

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not re-

quire complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art. Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence.

Applying this law to the facts already set forth, it is obvious that the two devices do the same thing in substantially the same way and accomplish substantially the same result, therefore the Richen machine product is subject to the royalty payments provided under the contract.

IT IS, THEREFORE, ORDERED that the judgment entered by this Court on August 15, 1975 in favor of the plaintiff Heltra, Inc. against Richen-Gemco, Inc. be, and the same is hereby, reinstated.

AND IT IS SO ORDERED.