Joseph **SCHMIDINGER** and **Tung-Sol Electric, Inc.,** Plaintiffs,

v.

**Marie J. WELSH,** James W. Welsh, **Welflash, Inc., Oxford Electric Corporation, and its Hudson Lamp Division, Hudson Lamp Co., Inc., Best Mfg. Co., Inc. and its Hudson Lamp Co., Inc., Division,** Defendants.

**Civ. No. 97-60.**

United States District Court
D. New Jersey.
July 26, 1965.

---

Steelman, Lafferty, Rowe & McMahon, Newark, N. J., Eyre, Mann & Lucas, New York City, of counsel, by William D. Lucas and Melvin H. Kurtz, New York City, for plaintiffs.

Walter A. Beers, Newark, N. J., Kenyon & Kenyon, New York City, of counsel, by Richard A. Huettner and William F. Noval, New York City, for defendants.

AUGELLI, District Judge.

This patent infringement suit involves the familiar automobile directional signal flasher.

Plaintiffs charge that the device manufactured and sold by defendants, which operates as a directional signal flasher for automobiles, is an infringement of claims 12, 17, 18, 23 and 26, of plaintiffs' United States Letters Patent No. Re. 24,-023, hereinafter referred to as the 023 patent.

The action arises under the patent laws of the United States, and more particularly under 35 U.S.C.A. § 271 and §§ 281 to 285 of the same title. Jurisdiction is conferred on the Court by 28 U.S.C.A. §§ 1338 and 1400(b).

By stipulation, plaintiffs' complaint was amended to include a claim of unfair competition against defendants for allegedly using plaintiffs' trade secrets and confidential information relating to mass production techniques, in the manufacture of the accused device.

Defendants deny infringement and put in issue the validity of the 023 patent. They also deny the allegations of the unfair competition claim. The parties have agreed that defendants' second and third counterclaims, charging plaintiffs with unfair competition and violations of the antitrust laws, are to be tried separately, and subsequent to, determination of the issues now before the Court.

The trial of this action consumed 23 days and resulted in a rather voluminous record, including over 100 exhibits. There was much expert testimony, supplemented by demonstrations in court showing the assembly of the component parts of the patented and accused devices, and the manner in which they functioned.

Plaintiff Joseph Schmidinger, a resident of the State of New York, is the patentee of the 023 patent in suit. Plaintiff Tung-Sol Electric, Inc., a Delaware corporation having its principal place of business in New Jersey, has for many years been engaged in the manufacture and sale of miniature lamps and electrical equipment, particularly for the automobile industry. It has an exclusive license under the 023 patent, subject to a nonexclusive license to Signal-Stat Corporation, a company that had previously been sued by plaintiffs in the United States District Court for the Eastern District of New York for infringement of the patent in suit.

Defendants Marie J. Welsh and her husband James W. Welsh, residents of New Jersey, organized the defendant Welflash, Inc., a New Jersey corporation, for the purpose of manufacturing and selling the device accused in this case. Unless otherwise stated, any references hereinafter made to "Welsh" shall be deemed to apply to defendant James W. Welsh.

Defendant Oxford Electric Corporation, an Illinois corporation, and its wholly owned subsidiaries, defendants Hudson Lamp Co. Inc. and Best Mfg. Co. Inc., both New Jersey corporations, have acquired all of the physical assets, manufacturing techniques and "know how" of Welflash, Inc., and continue to carry on the business of that company in the production of the accused device.

The patent in suit describes a snap action device of wide application, one that is both electrically and thermally responsive. It may be used as a relay, flasher, circuit breaker, overload protector, load indicator, switch, or thermostat. When the device is to be used as a switch, the specifications, after suggesting the dimensions and materials to be used in connection therewith, state that "a switch of such dimensions and of such material is suitable for use, for example, as a flasher for automobile direction signal and stop lights."

The structure [1] of the claims of the 023 patent may be said to comprise: a resilient metal plate or buckling member having an inherent permanent deforma-

---

1. Plaintiffs' device (P-2) is a small unit, measuring about 1 inch in height and a little less than 1½ inches in diameter. The electric terminals, which are plugged into the electric circuit of the automobile directional signal lamps, extend through the bottom of the base of the unit about ½ inch. In this particular device, the buckling member is circular in shape, with a diameter of ⅞ths of an inch and a thickness of .005 of an inch. The pull ribbon is 1/16th of an inch wide and .003 of an inch thick. The accused device looks the same, except that its buckling member is rectangular in shape, being ⅞ths of an inch long, ½ inch wide, and .0043 of an inch thick. The pull ribbon in this device is 1/16th of an inch wide and .0025 of an inch thick.

tion therein that runs straight through or across the member to provide a single stable position of configuration or constraint; a pull means, such as an expansible flexible ribbon attached at its outer ends to the convex side of the buckling member adjacent the ends of the deformation and preferably arranged parallel to the deformation; and, except in claim 26, a fixed support or electrical terminal that is attached to the pull means or ribbon. Snap action of the buckling member, in a uniform cyclic beat, is obtained by feeding electric current through the buckling member and pull ribbon in a divided circuit. Plaintiffs refer to the buckling member and pull ribbon of the device as the active elements thereof, and the fixed support, as the passive element.

In operation, and in the initial starting position, tension in the pull ribbon holds the buckling member in its snapped position. In this position the center of the buckling member is bowed out to form a channel positioned 90° to the permanent deformation and of opposite curvature thereto. The 90° channel of opposite curvature causes a gap to form between the buckling member and the pull ribbon. This 90° channel of opposite curvature is characteristic of the snap action of what plaintiffs termed the "hard" buckler of the patented device, which Schmidinger achieved by means of a single flexible pull ribbon arranged on the convex side of the buckling member parallel to the deformation.

When the buckling member is in its snapped position, a gap is formed between the buckling member and pull ribbon. At such time the electrical contacts are closed. When the operator of the automobile moves the signal lever into signaling position, electric current passes through the buckling member and pull ribbon in a divided flow to generate heat and relax the tension in the ribbon. As a result, the buckling member snaps to close the gap and open the electrical contacts. Thereupon, the buckling member and pull ribbon cool and contract, until the tension in the ribbon is restored

to snap the buckling member and open the gap. The electrical contacts again close, and the cycle is automatically repeated as long as the directional signal lever remains in signaling position.

In each of the two positions assumed by the buckling member in its back-and-forth snap action, there is a so-called "locking" effect, where the buckling member dwells in position. This dwelling in each position is due to the differential expansion and contraction of the pull ribbon and buckling member. The buckling member remains or dwells in each position while the pull ribbon is expanding or contracting, but thereafter suddenly snaps and moves very rapidly through an equilibrium position located between the two "locked" positions. The differential expansion and contraction are caused by the divided circuit flow of current through the buckling member and pull ribbon, and the ambient cooling thereof.

■ Defendants contend that the invention of the 023 patent was anticipated by the prior art; that the claims in suit are invalid for lack of invention over the prior art; and also, that said claims are invalid because they are indefinite and vague. At this point it is appropriate to refer to the claims.

Claim 12 must be read together with claim 10. So combined, the claim covers:

"10. A snap action device comprising a disc having an inherent diametral deformation therein tending to cause it to assume a constrained shape, a support element having laterally flexible pull means fastened thereto and radiating out therefrom, the outer ends of said pull means being fastened to points of said disc at opposite ends of the deformation therein and on the convex side thereof whereby when the tension in said pull means is reduced the center of the disc snaps in one direction to assume its constrained shape and when the tension in said pull means increases the snap action of the center of the disc occurs in the other direction.

"12. The snap action device according to claim 10 wherein said pull means and disc are of electrical conducting material and the tension in said pull means is varied by differential expansion and contraction of said pull means and disc with passage of current therethrough."

Claim 17 reads as follows:

"17. A thermal switch device comprising a support, a buckling member having a portion adapted to occupy two different positions for operating a circuit opening and closing contact, and linear expansible pull means carried by said support and fastened at two spaced points to said buckling member to control the buckling thereof to cause said portion to occupy one of said positions responsively to current flowing through the expansible means, and said buckling member being carried by said expansible pull means, the buckling member being the form of a constrained disc with the outer ends of the expansible means fastened to one side of the disc at diametrically opposite points adjacent its periphery."

Claim 18 is identical to claim 17, except that the buckling member is described as "being a disc of comparatively thin spring metal doubly constrained by having a transverse bend formed therein and by the pull of the expansible means fastened at its ends to the convex side of said bend."

Claim 23 covers:

"23. A thermal switch device comprising a support, a substantially circular buckling member carrying a contact and having an inherent constraint tending to move said contact through a dead center position to occupy a circuit controlling position and linear expansible pull means carried by said support and fastened to said buckling member at two spaced points on the opposite sides of a transverse line passing through said contact to control the buckling thereof responsively to current flowing through the expansible means and said buckling member being carried by said expansible pull means."

Claim 26 reads as follows:

"26. In a current responsive snap action device, a disc-like member of resilient electrically conductive material having a preformed crease along one diameter only to provide a single stable conformation in which the portions of the disc-like member on each side of the diameter form an included angle of less than 180°, and a flexible ribbon of electrically conductive material fixed to the disc-like member only at opposite ends of said diameter and overlying said diameter on the convex side of the crease, said disc-like member, depending upon the tension in said ribbon being either in the said position of stable conformation or in a position wherein it is bent oppositely thereto and about a diameter 90° to said preformed crease whereby differential expansion and contraction of said ribbon and disc-like member with passage of current therethrough changes the tension in said ribbon and causes snap action of said disc-like member through a neutral planar position from one to the other of said first mentioned positions."

As to invalidity of the claims because of anticipation, the parties are in agreement that no single prior art patent discloses a buckling member with unidirectional deformation therein having a flexible pull strip attached at its outer ends to the convex side of the buckling member and arranged parallel thereto to form the buckler of the 023 patent. Since no single prior art patent discloses the subject matter of the 023 patent as a whole, there has been no anticipation of the patented device. See Skelly Oil Co. v. Universal Oil Products Co., 31 F.2d 427, 431 (3 Cir. 1929); Baldwin-Southwark Corp. v. Tinius Olsen T. Mach. Co., 88 F.2d 910, 914 (3 Cir. 1937); South-

ern Phosphate Corp. v. Phosphate Recovery Corp., 102 F.2d 801 (3 Cir. 1939); Dewey & Almy Chemical Co. v. Mimex Co., 124 F.2d 986, 989 (2 Cir. 1942); Firestone v. Aluminum Company of America, 285 F.2d 928 (6 Cir. 1960); Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co., 332 F.2d 406 (6 Cir. 1964); 35 U.S.C.A. § 102.

As to invalidity of the claims because of lack of invention over the prior art, defendants take the position that even though the prior art may not anticipate the patent in question, the disclosures of the prior art in this case negative invention because all of the essential elements of the claims under attack are old and found in the prior art. See Leishman v. General Motors Corp., 191 F.2d 522, 530 (9 Cir. 1951); Firestone v. Aluminum Company of America, 285 F.2d 928 (6 Cir. 1960); Harvey v. Levine, 322 F.2d 481, 483 (6 Cir. 1963).

For example, as to claim 12, defendants point out that the essential elements of that claim are: a disc, with a diametral deformation; a support; and a laterally flexible pull means fastened to the support and radiating out therefrom with the outer ends of the pull means fastened to the disc at opposite ends of the diametral deformation.

As to claims 17, 18, and 23, defendants say that the essential elements in each of said claims are: a support; a constrained disc or a substantially circular buckling member, deformed with an inherent constraint; and a pull means attached to the support and carrying the circular buckling member.

As to claim 26, defendants point to two essential elements: a disc-like member of resilient electrically conductive material having a preformed crease along one diameter only to provide a single stable conformation in which the portions of this disc-like member on each side of the diameter form an included angle of less than 180°; and a flexible ribbon of electrically conductive material fixed to the disc-like member only at opposite ends of the diameter and over-lying said diameter on the convex side of the crease of said disc-like member, and said disc-like member, depending upon the tension in the ribbon, being either in a position of stable conformation or in a position wherein it is bent oppositely thereto and about a diameter of 90° to said preformed crease.

Defendants argue that Schmidinger, in developing the snap action device described in his patent, did nothing more than to borrow from the prior art the essential elements of claims 12, 17, 18, 23 and 26 of the 023 patent; that in combination these elements perform their normal and expected use to give a known result; and that Schmidinger added nothing new to the combination of the old elements, made no advancement in the field, and exercise no inventive skill.

The parties have cited 40 prior art patents to the Court as bearing on the claimed invention. All of them were the subject of expert testimony at the trial and analyzed in relation to the claims alleged to have been infringed.

In support of their argument of lack of invention, defendants refer to a number of the cited prior art patents that show snap action devices with buckling members of different design having inherent deformations tending to cause them to assume a constrained shape, and that also show support elements, and laterally flexible pull means. Illustrative are: Winger, 1,872,205; Hoopes, 2,024,362; Mottlau, 2,041,775; Dederick, 2,054,558; Burch, 2,253,552; Elmer, 2,266,537; Newton, 2,267,164; Mottlau, 1,680,429; Klahn, 1,784,450; Spencer, 1,813,776; Schmidinger, 2,321,049; Davis, 2,166,238; and Schmidinger, 2,133,309.

Plaintiffs admit that the elements of the patented device are separately disclosed in the prior art patents cited by defendants. It also appears that the prior art patents considered by the patent office during the prosecution of the application that resulted in the issuance of the 023 patent, some of which were noticed by defendants, separately dis-

858

closed round, square, and rectangular buckling members, mono and bimetallic in composition, with unidirectional deformations therein; flexible pull means of the type described in the 023 patent; and the use or flow of electric current in a divided circuit. The mere fact that all elements of a claim may be found or identified in prior art references does not necessarily negative invention. See Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Reiner v. I. Leon Co., 285 F.2d 501 (2 Cir. 1960); Firestone v. Aluminum Company of America, 285 F.2d 928 (6 Cir. 1960); Marvel Specialty Company v. Bell Hosiery Mills, Inc., 330 F.2d 164 (4 Cir. 1964).

But invention may be negatived if the subject matter of the patent, by reference to the pertinent prior art, would have been obvious, at the time the invention was made, to a person having ordinary skill in that art.

It thus becomes apparent that the test for patentability, as laid down in 35 U.S. C.A. § 103, is controlling on the issue of the validity or invalidity of the claims in suit.

Section 103 provides that a patent may not be obtained " * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."

In considering the question of obviousness under section 103, the prior art must be viewed from the point in time just prior to when the patented device was made. Many things may seem obvious after they have been made, hence courts must guard against the use of hindsight. Diamond Rubber Co. v. Consol. Tire Co., 220 U.S. 428, 435, 31 S.Ct. 444, 55 L.Ed. 527 (1911); Craft-Stone, Inc. v. Zenitherm Co., 22 F.2d 401, 402 (3 Cir. 1927); Marvel Specialty Company v. Bell Hosiery Mills, Inc., 330 F.2d 164, 172 (4 Cir. 1964); Monroe Auto Equipment Co. v. Heckethorn Mfg. & Sup. Co., 332 F.2d 406, 412 (6 Cir. 1964).

The difficulty of determining subjectively at some removed time whether a particular invention would have been obvious to a person of ordinary skill in the art, has caused some courts to seek objective criteria of obviousness. Reiner v. I. Leon Co., 285 F.2d 501 (2 Cir. 1960); Marvel Specialty Company v. Bell Hosiery Mills, Inc., 330 F.2d 164 (4 Cir. 1964). See also Drumhead Co. of America v. Hammond, 18 F.Supp. 734 (W.D. Pa.1936); R. M. Palmer Company v. Luden's, Inc., 128 F.Supp. 672 (E.D.Pa. 1955).

With these principles in mind, it becomes pertinent to inquire whether, in light of the prior art, it would have been obvious to a person having ordinary skill in the art, at the time the invention was made, to produce the snap action device described in the 023 patent. This Court thinks not.

It was back in 1931 that plaintiff Schmidinger first became interested in automobile signal installations. He sought to devise a switch that would function in the electrical system of an automobile automatically to open and close electrical contacts, and interrupt the flow of current to directional signal lamps. This was a switch that would, in operation, cause the signal lamps of an automobile to flash on and off, and indicate the direction of turn of the car.

In 1932, Schmidinger devised a switch that he hoped would meet basic requirements for operation as a flasher in an automobile electrical system. This first Schmidinger switch employed an electromagnet in conjunction with a tensioned wire to control an armature adapted to open and close electric contacts in the signal lamp circuit. This electromagnetic flasher device was composed of some 30 odd parts and lacked reliability in performance. It was offered to the automobile companies in 1932 and 1933, but was rejected.

In 1934, Schmidinger devised a snap action flasher device called the sprung

vane flasher, which was the subject matter of Schmidinger patent No. 2,074,-345, now expired. This device was made up of only a few parts and had no electromagnet. It had utility for automatically interrupting the flow of electric current in a circuit in a uniform cyclic beat, but operated only if the current load did not exceed about 1 ampere. Since the load in the automobile electrical systems at the time was in excess of 1 ampere, the sprung vane flasher switch did not meet the requirements for control of automobile directional signal lamps. Schmidinger tried for years to improve this switch, but was unsuccessful. In addition to the efforts directed to the sprung vane flasher switch, Schmidinger continued his work to improve the operation of his electromagnetic switch and to reduce the cost thereof.

In 1937–1938, Schmidinger submitted an improved electromagnetic flasher to the Buick Motor Car Company, and this switch was accepted and installed in the 1939 Buick automobile. This device was the subject matter of Schmidinger patent No. 2,103,276, now expired. The 1939 Buick was the first American made motor vehicle to use flashing lights to indicate the direction of turn of the car, and the Schmidinger electromagnetic flasher was the first commercially used device for that purpose. Since that time, more than 40 states have enacted laws making the use of flashing directional signals on automobles mandatory, and such signaling devices have become standard equipment in all new automobiles.

From 1939 to 1955, the only other commercially used automobile flasher was manufactured by the Fasco Company. The Fasco flasher came on the market after World War II. It used an electromagnet in conjunction with a bimetal element to control an armature adapted to open and close electric contacts in the signal lamp circuit. When, in 1953–1955, the automobile companies changed over from the 6 volt to the 12 volt electrical system in their cars, the amperage in the circuit of the directional signal lamps dropped from 5.2 amperes to 3.6 amperes. At the lower amperage, the Fasco flasher could not operate properly, and when, in 1955, all of the new automobiles were equipped with a 12 volt electrical system, the Fasco flasher went off the market.

The evidence in this case clearly establishes that Schmidinger, since 1931, devoted his energies to the problem of inventing a flasher switch for automobile directional signals. For many years, the automobile companies were interested in the development of such a device. As already stated, the Schmidinger electromagnetic flasher switch was the first device found suitable for this purpose, and appeared in the 1939 Buick automobile.

It was not until 1943, that Schmidinger developed the snap action device of the patent in suit, with very few parts, no electromagnet, and no bimetallic element. The production of such a device under the 023 patent has been the only commercial use made of that patent. That there was a long standing need for a simple and inexpensive flasher switch for control of automobile directional signals is evidenced by its rapid and widespread commercial success. The first commercial sales of the Schmidinger flasher device were made by plaintiff Tung-Sol in early 1956. Within three years, this flasher had captured 80% of the automobile market, and shortly thereafter completely displaced the Schmidinger electromagnetic flasher. Other flashers presently on the market are those manufactured by Signal-Stat Corporation, as licensee of the Schmidinger patent, and the accused device made by defendants.

In addition to Schmidinger, other workers in the field, with the same prior art available to them as was available to Schmidinger, tried to develop a satisfactory flasher switch for automobiles without an electromagnet. Yet these men failed where Schmidinger succeeded. A number of patents were obtained by assignors to General Motors Corporation and others, but none of the devices cov-

ered by those patents attained commercial success or were used in any automobiles. Cited to the Court in this connection were the following patents: Harmon, 2,354,635; Berninger, 2,388,033; Sitzer, 2,537,485; Perry, 2,644,899; Cromwell, 2,788,414; Flatt, 2,820,120.

Thus, while it is true that the buckling member, flexible pull ribbon, and divided circuit of the 023 patent are each found in separate prior art patents, the fact is that these elements are so interrelated in the structure of the Schmidinger invention as to form a single integral unit that functions in a new and novel manner not disclosed in the prior art patents. The interrelationship of the parts, as put together by Schmidinger, and their functioning dependency on each other, has produced a unit capable of performing the reciprocating snap action with its "locking" effect, and of generating the heavy snap forces required for opening and closing the electrical contacts with firm contact pressure, fast make and break of contacts, and uniform cyclic beat. None of the prior art structures contain the interrelationship of the parts found in the Schmidinger device, and none of them were capable of performing the operation or producing the result of the structure of the patent in suit.

The Court is satisfied from all the evidence, and so finds, that the subject matter of the 023 patent was not obvious at the time of invention to a person having ordinary skill in the art. It follows that the claims in suit are not invalid for lack of invention over the prior art. See Imhaeuser v. Buerk, 101 U.S. 647, 660, 25 L.Ed. 945 (1879); Great A. & P. Tea Co. v. Supermarket Corp., 340 U.S. 147, 151–152, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Julius Levine & Co. v. Automatic Paper Machinery Co., 63 F.2d 547, 549–550 (3 Cir. 1933); Reiner v. I. Leon Co., 285 F.2d 501 (2 Cir. 1960); 35 U.S. C.A. § 103.

Defendants also argue that the claims in suit are invalid because they are vague and indefinite and not in compliance with 35 U.S.C.A. § 112. They contend that the patent document does not teach the art how to make a commercially operative device. While the testimony of the experts is in conflict on this point, the Court is satisfied that the greater weight of credible testimony amply supports plaintiffs' position that a person having ordinary skill in the art could make the flasher switch for control of passenger automobile directional signal lamps by following the teachings of the 023 patent.

With particular reference to claim 26, defendants assert that the device of that claim is merely a toy because it lacks a support. However, while a support may be necessary for an operable structure, it is not a basic element of the invention, and need not, therefore, be set forth in the claim. It is quite apparent that one skilled in the art would know how to support the device of claim 26 in order to make it operable. See Deering v. Winona Harvester Works, 155 U.S. 286, 302, 15 S.Ct. 118, 39 L.Ed. 153 (1894); Johnson Co. v. Philad Co., 96 F.2d 442, 443 (9 Cir. 1938). It is also to be noted that a patent claim is not intended to be a manufacturing specification. See Application of Gay, 309 F.2d 769, 774 (CCPA 1962).

Another attack on the validity of the claims in suit is that some of them are functional in that the invention is stated in terms of result achieved rather than in terms of method of achievement. If the claims were so limited, they would indeed be invalid. But the claims here particularly point out and distinctly claim what Schmidinger regards as his invention. The functional statements appearing in the claims concerning the operation of the basic elements of the invention tend to make them more, rather than less, definite and specific. The "whereby" clauses appearing in the claims do not render the claims functional. See Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 12, 67 S.Ct. 6, 91 L.Ed. 3 (1946); S. D. Warren Co. v. Nashua Gummed & Coated Paper Co., 205 F.2d 602 (1 Cir. 1953).

It is further contended by defendants that the claims are indefinite and vague

in regard to the angle of bend of the deformation or crease in the buckling member. Claim 26 states that the portions of the disc-like buckling member on each side of the deformation should form an included angle of less than 180°, without any specific mention of how much less than 180° the angle could or should be. However, the patent specification clearly sets forth "that the dihedral angle formed at the crease [of the buckling member] lies between 135° and 180°, say 170°." A person skilled in the art would have no difficulty in following the teachings of the patent claims in light of this specification. See S. D. Warren Co. v. Nashua Gummed & Coated Paper Co., supra; Torok v. Watson, 122 F.Supp. 788, 793 (D.D.C.1954). Under all of the circumstances, the Court finds that the claims in suit are not invalid for fatal indefiniteness, as alleged by defendants.

■ The statute, 35 U.S.C.A. § 282, declares that a patent shall be presumed to be valid, and that the burden of establishing invalidity shall rest on the party asserting it. This burden is a heavy one. See Mumm v. Jacob E. Decker & Sons, 301 U.S. 168, 171, 57 S.Ct. 675, 81 L.Ed. 983 (1937). Defendants here, in the Court's opinion, have failed to carry the burden imposed upon them by law. While the presumption of validity is by no means conclusive, it is strengthened where, as here, the Court finds that the patents upon which defendants rely (Smith, 2,487,684; Burch, 2,402,312; Dederick, 2,054,558; and Spencer, 1,448,-240; 1,697,886; 1,711,430; 1,776,012; 1,883,252; 1,939,286; 1,602,510; 1,-813,776), fail to add anything to the prior art disclosures considered by the patent office during prosecution of the applications that resulted in the issuance of the 023 patent. See Williams Mfg. Co. v. United Shoe Mach. Corporation, 121 F.2d 273, 277 (6 Cir. 1941).

It remains to consider whether the accused device infringes the claims of the patent in suit, and whether the doctrine of file wrapper estoppel has any application to the facts of the case.

■ The burden of proving infringement rests upon plaintiffs. General Chemical Co. v. Selden Co., 60 F.2d 144, 150 (W.D.Pa.1932).

Defendants take the position that the claims of the patent in suit are limited to a combination of specific elements arranged in a particular manner, which are not found in the accused device; that file wrapper estoppel prevents plaintiffs from broadening the claims to cover the accused device because of the abandonment and amendment of claims during patent office prosecution; and that since the accused device does not read upon the claims, and does not function in the same manner specified in the patent to produce the same result, there is no infringement.

Plaintiffs argue that defendants utilize the principle of the invention of the 023 patent and infringe the claims under the equitable doctrine of equivalents, and that nothing that transpired in the patent office proceedings estops them from resorting to that doctrine.

The accused device follows generally the teachings of the claims in issue. It is constructed and operates as a flasher switch substantially as described in the 023 patent. The patent document teaches the application of the principle of the Schmidinger invention to a flasher switch that can be made to operate as an automobile directional signaling device. Reference has already been made in this opinion to the specific language of the specifications relating to "a flasher for automobile direction signal and stop lights."

Defendants stress the differences in the shapes of the buckling members, and the location and attachment of the fixed supports and movable contacts in the patented and accused devices.

In the accused device, the buckling member is rectangular in shape. In the patented device, it is circular. In the claims in issue, the buckling member is described as a "disc", "disc-like", or "substantially circular".

In the accused device, the fixed support is attached to the buckling member, and the movable contact is mounted on the pull ribbon. In the patented device, the fixed support is attached to the pull ribbon, and the movable contact is mounted on the buckling member. Claim 26 makes no mention of either a fixed support or movable contact.

Defendants focus entirely too much attention on the physical structure selected by Schmidinger to illustrate the principle of his invention, and apparently seek to limit or restrict the 023 patent to that structure. While it may be that defendants have not been guilty of a literal infringement of the patent, the infringement is nevertheless established under the range of equivalents to which a patent is normally entitled.

■ The Court finds that the shape of the buckling member, whether circular or rectangular, is not a material part of the Schmidinger invention, and has no effect on the operation of the device. The prior art patents, as previously noted, disclosed buckling members of varying sizes and shapes. It is also clear that the reversal of parts, the fixed supports and movable contacts, likewise has no effect on the functioning of the unit. These are mere differences in detail that do not affect the substance of the invention. Put side by side, the fact is that the accused device, notwithstanding the changes indicated, does the same work, in substantially the same way, and accomplishes the same result as the patented device. Under the so-called doctrine of equivalents, the accused device does not avoid infringement by these inconsequential variations in structure. See Winans v. Denmead, 56 U.S. 329, 342, 15 How. 329, 14 L.Ed. 717 (1853); Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Piano Motors Corporation v. Motor Player Corporation, 282 F. 435, 439 (3 Cir. 1922); Knight v. Tollner Electric Co., 42 F.2d 264 (E.D.N.Y. 1930); Reitzsch v. Paradis, 83 F.2d 273 (3 Cir. 1936); Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124, 137 (2 Cir. 1958); Baldwin-Lima-Hamilton Corp. v. Tatnall Meas. Sys. Co., 169 F.Supp. 1, 8 (E.D.Pa.1958); Marvel Specialty Company v. Bell Hosiery Mills, Inc., 330 F.2d 164, 174 (4 Cir. 1964).

Defendants point to other differences in the accused and patented devices in support of their argument of non-infringement. They call attention to the fact that the pull ribbon in the accused device is positioned two-thirds of the way down from the top of the buckling member, while in the patented device the ribbon is located at the dead center of the deformation of the buckling member; that the center of the buckling member in the accused device is not free to move because the fixed support is attached to it, while in the patented device the buckling member moves and snaps at the center; and that the buckling member in the accused device, unlike the buckling member in the patented device, does not have a permanent unidirectional deformation or preformed crease with planar sides and an included angle of less than 180°.

The Court finds that the claims in issue do not require that the pull ribbon be located at the dead center of the deformation of the buckling member. It was shown at trial that whether or not the ribbon is off dead center has no effect on the operation of the device. It was also demonstrated that the buckling member of the accused device does in fact snap at the center since the support is attached near the bottom edge of said buckling member. And it was also made apparent that the buckling member of the accused device does contain a deformation or crease which functions substantially as described in the patent.

■ On the whole case, the Court is satisfied from the evidence, from visual examination of the patented and accused devices, and from demonstrations in court, that the accused device infringes claims 12, 17, 18, 23 and 26 of the 023 patent.

With respect to file wrapper estoppel, the record shows that on July 6, 1944,

Schmidinger filed patent application, Serial No. 543,623, for a device called "Thermal Control Means"; on July 18, 1950, he filed another patent application, Serial No. 174,411, entitled "Thermal Switch for Circuit Control"; and on July 21, 1951, he filed a third patent application, Serial No. 237,958, for a "Snap Action Device". On August 2, 1951, Schmidinger abandoned the first two applications in favor of a continuation-in-part of the third application, which issued as patent 2,615,106 on October 21, 1952. On July 14, 1955, this patent was reissued as the patent in suit following Schmidinger's filing of patent application Serial No. 427,406 on May 3, 1954, also for a "Snap Action Device". Claims 12, 17, 18 and 23 of the 106 patent are the same as those bearing corresponding numbers in the 023 patent. Claims 25 and 26 are added claims.

Defendants argue that an analysis of the patent applications and the cancellation and restriction of claims in connection with their prosecution in the patent office, show that plaintiffs are estopped from asserting infringement by a device that does not literally read upon the claims of the patent in suit. More specifically, defendants say plaintiffs are restricted by the terms of the claims to a buckling member that is a "disc" or circular in shape, and a structure in which the fixed support is attached to the pull ribbon, and that resort may not be had to the doctrine of equivalents to overcome these limitations.

Under the doctrine of file wrapper estoppel, a patentee who is compelled by the patent office to insert a narrowing limitation into a claim to avoid rejection on the prior art, cannot thereafter broaden said claim by eliminating the narrowing limitation in order to establish infringement. See Shepard v. Carrigan, 116 U.S. 593, 597, 6 S.Ct. 493, 29 L.Ed. 723 (1886); Abercrombie & Fitch Co. v. Baldwin, 245 U.S. 198, 208, 38 S.Ct. 104, 62 L.Ed. 240 (1917); Weber Elec. Co. v. E. H. Freeman Elec. Co., 256 U.S. 668, 677, 41 S.Ct. 600, 65 L.Ed. 1162 (1921); I. T. S. Rubber Co. v. Essex Co., 272 U.S. 429, 443, 47 S.Ct. 136, 71 L.Ed. 335 (1926); Exhibit Supply Co. v. Ace Corp., 315 U.S. 126, 136, 62 S.Ct. 513, 86 L.Ed. 736 (1942).

The Court has made a careful examination of the file wrapper history of the patent in suit, designated as cases 1, 2, 3 and 4, and finds nothing therein that would limit the claims in suit to a specific form or shape of buckling member or to a structure in which the fixed support can only be attached to the pull ribbon. The evidence in this case discloses that at no time during prosecution of the several applications in the patent office did Schmidinger insert the word "disc" or the expression "support attached to pull ribbon" into any of the claims in order to overcome or avoid a rejection on the prior art patents. Nor does it appear that Schmidinger abandoned all shapes for his buckling member, other than round, when he made an election of species of a disc. In fact, the patentee at all times asserted claims to a buckling member regardless of shape, or to a "disc-like" buckling member which was the equivalent of the other shaped buckling members of the prior art patents. As to the support, Schmidinger obtained in claim 26, as well as in claim 25, the allowance of a claim with no limitation to, or even mention of, a support. For these reasons, the Court finds that file wrapper estoppel is not present in this case.

As stated earlier in this opinion, plaintiffs also assert a cause of action for unfair competition against defendants for allegedly using in their manufacture of the accused device, certain confidential information and trade secrets claimed to have been acquired by Welsh while in the employ of Tung-Sol. In a notice filed in this action on January 3, 1964, plaintiffs advised defendants that they would rely upon certain items of confidential information, manufacturing techniques, and test procedures in support of this cause of action. These items, covering six different categories, were separately treated at the trial, and the specification of said items, as well as answers to interrogatories pertaining thereto, and depo-

sitions, were placed in sealed envelopes. The testimony of witnesses who testified in court on this phase of the case appears in a separate volume. The Court has been requested not to disclose any of the details concerning plaintiffs' trade secrets in its opinion. This request will, of course, be honored, and only general references will be made to those matters considered confidential by plaintiffs.

Defendants take the position that none of the items specified by plaintiffs are in fact trade secrets; that every category of plaintiffs' so-called "trade secrets and confidential information", is generally known in the trade and published in numerous patents and other publications; and that even if defendants were using such material, which they deny, they would incur no liability to plaintiffs.

The specification of confidential information and trade secrets filed by plaintiffs related to the importance of measurement of snap and unsnap forces in the buckling member; the use of a gauge to measure such forces; the importance of measurement of bow height in the buckling member; the requirement that the material used for the buckling member be heat treated for hardness; the importance of a burr-free cut in forming the buckling member; and the necessity for obtaining a pull ribbon of such hardness that it will not stretch during use.

The testimony at trial went somewhat beyond the specific items listed by plaintiffs, and discussed "control" rather than "measurement" of snap forces in the buckling member and bow height of the assembled unit. This control was said to be of advantage in reducing "shrinkage" which would otherwise result due to the inability of suppliers to maintain absolute uniformity in the physical characteristics of the raw materials. There was also testimony regarding the advantage of using a particular metal of a particular hardness in the buckling member and pull ribbon to insure long life and ease of manual adjustment. It was also stated that the combination of the metals used in the buckling member and pull ribbon were advantageous in making pos-

sible a tight weld that would not slip. Finally, there was testimony that efforts had been made by Tung-Sol to achieve complete automation in production, but that after extensive investigation it was found that such could not be accomplished, and that some manual adjustment of the units was necessary. Tung-Sol says that knowledge of this fact (that complete automation is not possible, and that some manual adjustment of the units is necessary) would be of advantage to a competitor, by saving him the time and effort to find this fact out for himself.

Defendants object to so much of the testimony offered by plaintiffs that goes beyond the trade secrets and confidential information listed by them in the notice filed in this action. While there has been some broadening of said items, the Court is satisfied that most of the alleged "new matter" may reasonably be considered to come within the scope of the items formally listed by plaintiffs.

Before passing upon the merits of plaintiffs' cause of action for unfair competition, it is appropriate to note some general principles of law governing trade secrets and confidential information in the area of employer-employee relations. The attack here is directed primarily at Welsh for allegedly appropriating to his own sue, plaintiffs' trade secrets and other information in violation of a confidential relationship.

The burden of proof rests upon plaintiffs to prove that what they allege to be trade secrets or confidential information are in fact secret or confidential; that disclosures thereof were made to Welsh in confidence; and that defendants used these disclosures to the detriment of plaintiffs. See Smoley v. New Jersey Zinc Co., 106 F.2d 314 (3 Cir. 1939); American Sign and Indicator Corp. v. Schulenburg, 167 F.Supp. 20, 27 (E.D.Ill.1958); General Steel Products Company v. Lorenz, 204 F.Supp. 518, 539 (S.D.Fla.1962).

It is well established that a former employee owes a duty of loyalty

to his former employer not to use trade secrets or information imparted to him in confidence, after there has been a termination of the employment relationship. There need be no express agreement in this regard. In the absence of contract, the obligation to refrain from using or disclosing a former employer's trade secrets after the employer-employee relationship ceases, will be imposed by law. The gist of the action is the breach of confidence resulting in conduct below that of established business morality. But it is also a well established rule that an employee has an unqualified right to leave his employment and use for himself or disclose to a competitor of his former employer, the skills and knowledge acquired in the earlier employment. See Midland-Ross Corporation v. Yokana, 293 F.2d 411, 412 (3 Cir. 1961); Sun Dial Corp. v. Rideout, 16 N.J. 252, 108 A.2d 442 (1954).

 The subject matter of a trade secret must, in fact, be secret, but it need not rise to the dignity of a patentable invention. While not susceptible of exact definition, a trade secret may consist of any "formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." But "[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret." Restatement, Torts, § 757, pp. 5, 6 (1939). See also, Sun Dial Corp. v. Rideout, supra, 16 N.J. at p. 257, 108 A.2d 442; Smoley v. New Jersey Zinc Co., 24 F.Supp. 294, 300 (D. N.J.1938), aff'd, 3 Cir., 106 F.2d 315; Dollac Corporation v. Margon Corporation, 164 F.Supp. 41, 57 (D.N.J.1958); Midland-Ross Corporation v. Yokana, 185 F.Supp. 594 (D.N.J.1960), aff'd 3 Cir., 293 F.2d 411.

 A careful consideration of that part of the record relating to plaintiffs' cause of action for unfair competition leads the Court to conclude, in light of applicable law, that plaintiffs have not sustained their burden of proving by a preponderance of the evidence that what they claim as confidential information and trade secrets are in fact such, or, if they could be so classified, that defendants have utilized such data in their mass production of the infringing device.

With respect to the measurement of snap and unsnap forces in a buckling member, and the use of a gauge to measure such forces, a witness for plaintiffs admitted, that as a general proposition, his work in measuring the snap and unsnap forces of the buckling member of the Schmidinger device, involved no more than the application of ordinary engineering skill to obtain uniformity of these forces. This same witness also admitted that the gauge developed by him to measure these forces was a simple device capable of being constructed by a senior engineering student and required no more than ordinary engineering skill in its construction. But even if plaintiffs' method of measuring the snap and unsnap forces of a buckling member could be said to be a trade secret or classified as confidential, there is no proof that defendants use a gauge or other instrument to measure the snap and unsnap forces of the buckling member of the devices made by them.

Another alleged trade secret of plaintiffs has to do with measurement of the distance between the pull ribbon and the bottom of the channel formed in the buckling member in its cold snapped position. This distance is called the "bow height". A visual examination of the patented device shows that the bow height is inherent in the construction of the device, and it would be a simple matter to measure this distance. The Schmidinger 106 patent, in figure 6, shows that the bow height is inherently formed when the pull ribbon is tensioned. It also appears from the 023 patent in suit that tension in the pull ribbon may be adjusted for desired operation of the snap action device. Even if it be assumed that the importance

of measurement of bow height in a buckling member, and the method of achieving such measurement is a trade secret, there is no evidence that defendants concern themselves with measurement of the bow height in any of their devices, or that they use a gauge or other instrument to measure the bow height of any of the devices made by them.

The heat treatment of the material of the buckling member to obtain satisfactory hardness is another item listed by plaintiffs as a trade secret. It is a well known principle that metals may be heat treated in order to harden them or vary internal stresses. It is admitted that this is well known in the art and is taught in courses leading to an engineering degree. Such treatment of metals is disclosed in a number of patents. See Hoopes, 2,024,362; Mottlau, 2,041,-775. Schmidinger, in the 023 patent in suit, teaches that the metal used in the buckling member of his snap action device may be heat treated in order to permanize the constraint therein. Information concerning treatment of metals for particular uses and purposes appears in the trade literature put out by the major suppliers in the metal industry. The evidence discloses that both Welsh and Tung-Sol consulted with their suppliers regarding appropriate metals for use in their devices, and the manner of treatment of such metals to obtain the requisite hardness.

As to the importance of a clean cut with no burrs in forming the buckling member, it is difficult to attribute to this operation anything in the nature of a trade secret. The testimony establishes that it is a well known and long recognized engineering principle that when metal is cut, it is preferable that the metal be burr free after the cut. There is no evidence that defendants at any time considered it important to have a burr-free cut in forming the buckling members used in their device.

The last of the six items specified in the notice filed by plaintiffs, deals with the necessity for obtaining a pull ribbon

of a hardness that will prevent stretching during use. It is admitted, as a well known and long recognized engineering principle, that if a metal is to be used for a repetitive pulling operation, a metal must be selected that will not stretch. A Tung-Sol witness admitted that Nichrome wire is very popular for use as a heating wire. Schmidinger, in the 023 patent in suit, recommends use of a nickel alloy as the material for the pull ribbon when the snap action device is to be used as a flasher. Perry, in 2,644,899, a patent noticed by plaintiffs, recommends Nichrome wire in the pull wire of the flasher covered by his patent. Under the circumstances, plaintiffs may not claim a trade secret in that which has been shown to be a matter of common knowledge.

The expansion of these alleged trade secrets beyond the scope indicated by the notice filed in this case on January 3, 1964, does not help plaintiffs. Whether one talks in terms of "measurement" or "control" of the forces in the buckling member of a snap action device, or "measurement" or "control" in the bow height of the assembled unit, the same observations made by the Court regarding measurement of the snap and unsnap forces in a buckling member, and measurement of bow height, apply here as well.

The new matter also stressed the importance of using particular metals of a particular hardness in the buckling member and pull ribbon of the device for ease of manual adjustment and long operating life of the flasher. For reasons already stated, use of these metals cannot be claimed as a trade secret. Disclosures in this connection will be found in the 023 patent in suit, and in Perry 2,644,899. See also: Winger, 1,872,205; Elmer, 2,-266,537; Klahn, 1,784,450; Spencer, 1,-602,510.

Another expansion of the original specification of trade secrets stated that the combination of certain named metals used in the buckling member and pull ribbon of the patented device was of advantage

in producing a tight weld that would not slip. The proofs show that plaintiffs use a commercially available welding machine in their welding operations. Apparently, what is alleged to be secret is the adjustments made to that machine to produce the desired weld. This involves experimentation until the machine is set in regard to pressure and timing. It is admitted that a person skilled in the welding art, by the use of a device used by plaintiffs, also commercially available, could make the various changes in pressure and timing on the welding machine to bring about the desired result. If the tight weld mentioned by plaintiffs is due to the characteristics of the metals used, there would be no basis for the claim of trade secret because such metals have been commonly used in the manufacture of snap action devices. On the other hand, if the secret is said to be the adjustments made in the welding machine, there is no proof that the welding methods employed by plaintiffs are used by defendants.

In the last of the new matters, plaintiffs assert that knowledge of the fact that the flasher units had to be manually adjusted, and that complete automation in production was not possible, would be advantageous to a competitor in that he would save the time and effort expended by Tung-Sol to ascertain this fact. This assertion borders on speculation. A competitor of Tung-Sol might well achieve complete automation in production. It is difficult to see how the "failure" to accomplish something, can be classified as confidential or a trade secret. Moreover, manual adjustment of snap action devices, such as a flasher switch, is not new. Schmidinger, in the 023 patent in suit, teaches that his snap action device can be manually adjusted by tensioning the pull ribbon.

The Court is satisfied from the evidence in this case that the manufacturing operations in the mass production of the patented and accused devices differ in many material respects. As compared with the test procedures and techniques employed by plaintiffs, those used by defendants may be characterized as comparatively crude.

Other considerations also have a bearing in this case. Welsh was a graduate engineer, with a degree in Electrical Engineering, when he went to work for Tung-Sol in 1944. He, himself, was the patentee of three patents covering snap action devices. Welsh quit Tung-Sol's employ in September 1952. It is true that following a demonstration of the Schmidinger device to the management of Tung-Sol in December, 1950, Welsh was instructed to work on the development of techniques for its mass production. It is not at all clear just what was accomplished by Welsh and his co-workers in furtherance of mass production methods from December 1950 to September 1952. Tung-Sol claims that the basic techniques for mass production of the Schmidinger device had been perfected during that period. This is denied. Entirely too much is left to conjecture. That there was much experimentation is not open to question. One thing is clear, however, and that is that Tung-Sol was far from mass production of the patented device in 1952. It had, at that time, only a pilot line in operation. It was not until the early part of 1956, that Tung-Sol made its first commercial sales of the Schmidinger flasher switch.

It is also interesting to note that after leaving Tung-Sol, Welsh found employment with Signal-Stat Corporation. This was in or about November 1952. Within a month's time, Welsh made a flasher switch that Tung-Sol considered to be an infringement of the 023 patent. In November 1956, after a lapse of four years, Tung-Sol sued Signal-Stat for the alleged infringement. Welsh was not made a party defendant to the action. The complaint in that action, notwithstanding that Signal-Stat had been commercially mass producing the Welsh flasher, made no charges of unfair competition or viola-

868

tions of trade secrets against either Signal-Stat or Welsh. The litigation was settled by Tung-Sol granting to Signal-Stat a non-exclusive license under the 023 patent, limited to the manufacture and sale of the Welsh device.

██ Welsh remained in the employ of Signal-Stat until July 1959, during which period Signal-Stat continued to mass produce the device that was the subject of the 1956 infringement action. Eight years after leaving Tung-Sol's employ Welsh, for the first time, by amendment to the complaint filed in this action, was accused of appropriating plaintiffs' trade secrets and other information in violation of a confidential relationship. It seems strange that this charge was not made in the 1956 Signal-Stat infringement suit. The protestation that "plaintiffs promptly asserted their rights as soon as the knowledge of the facts of unfair competition became available", is not too persuasive. Even assuming a basis for plaintiffs' cause of action, the long delay and lack of diligence on the part of plaintiffs, plus Welsh's change of position over the years, would justify invoking the doctrine of laches to bar relief.

Plaintiffs' cause of action for unfair competition will be dismissed. On the patent infringement suit, plaintiffs' application for counsel fees will be denied. With respect to damages in that action, the Court will reserve decision, until after damages are assessed, as to whether said damages should be increased as permitted by 35 U.S.C.A. § 284.

Counsel for plaintiffs, on notice to counsel for defendants, will please submit a proposed order providing for an injunction and accounting in the patent infringement action, for a dismissal of defendants' first counterclaim challenging the validity of said patent, and for a dismissal of plaintiffs' cause of action for unfair competition.

This opinion shall constitute findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.