**BLAW–KNOX COMPANY, a Delaware Corporation, Plaintiff,**

v.

**HARTSVILLE OIL MILL, a South Carolina Corporation, and the French Oil Mill Machinery Company, Defendants.**

**Civ. A. No. 7847.**

United States District Court
D. South Carolina,
Florence Division.

June 8, 1967.

John T. Roddey, of Roddey, Sumwalt & Carpenter, Rock Hill, S. C., Blenko, Hoopes, Leonard & Buell, and William Henry Venable, Pittsburgh, Pa., for plaintiff.

Philip Wilmeth, Hartsville, S. C., Karl B. Lutz, Pittsburgh, Pa., and T. Russell Foster, Hartsville, S. C., for defendants.

HEMPHILL, District Judge.

This is a civil action for infringement of United States Patent No. 2,840,459, dated June 24, 1958 which shall be referred to as the Karnofsky patent. The Karnofsky patent was issued to the plaintiff as the assignee of George B. Karnofsky, and title has remained in the plaintiff ever since. The defendant French Oil Mill Machinery Company has counterclaimed for a declaration that the Karnofsky patent is invalid and not infringed in toto. The court has jurisdiction of the parties and subject matter under 28 U.S.C. §§ 1338(a) and 1400(b). Jurisdiction is not contested.

The plaintiff Blaw-Knox Company is a Delaware corporation having its principal place of business at Pittsburgh, Pennsylvania.

The defendant Hartsville Oil Mill is a South Carolina corporation having its principal place of business at Hartsville, South Carolina.

The defendant French Oil Mill Machinery Company is an Ohio corporation having its principal place of business at Piqua, Ohio. French Oil intervened on its own motion and has conducted the defense of the action in fulfillment of a patent protection provision contained in the sales contract for the solvent extractor here said to infringe, French Oil having manufactured the accused solvent extractor and installed it on the premises of Hartsville Oil at Hartsville, South Carolina.

The matter was heard by the court without a jury, therefore the facts shall be found specially and the conclusions of law stated separately.

### FINDINGS OF FACT

1. The Karnofsky patent is for a method and apparatus for continuously extracting oil and other soluble material from solid material by the use of liquid solvents. "Solvent extraction" may be described sufficiently for present purposes as a process whereby a prepared oil bearing material is contacted by a solvent which dissolves the oil from the material.

2. The Karnofsky patent contains twenty-eight apparatus claims and four process claims, and plaintiff has selected claims 8 (apparatus) and 32 (method) as typical of the two groups. The defendants, by counterclaim, seek a judgment that all the claims are invalid. The plaintiff submits that the court need consider only claims 8 and 32, as representative claims, and that the plaintiff's case will stand or fall upon the decision as to them.

3. Apparatus claim 8 is as follows:

A continuous solvent extractor for vegetable oils or the like, comprising, a rotor having a substantially vertical axis, a plurality of substantially vertically and radially divided cells disposed around said axis, said cells being open at the top and adapted to contain oil-bearing solid material for intimate contact therein with solvent and solvent solution of varying degrees of richness during the rotation thereof, a perforated closure adjacent the bottom of said cells adapted to permit the continuous draining of said solvent and solvent solution through said cells, a plurality of compartments positioned adjacent the bottoms of said cells along the path of their rotation and adapted to collect said solvent and solvent solution draining from said cells, means connected to a majority of said compartments for circulating the contents thereof to said cells at a plurality of separated positions respectively along said path of rotation to effect substantially countercurrent flow of solvent and solvent solution and of solid material.

4. Method claim 32 is as follows:

In a continuous system for the solvent extraction of oils or the like from solid

particles, the steps comprising, separately confining a succession of masses of solid oil-containing particles independently from one another, moving said succession of masses through a closed rotary path in a substantially horizontal plane, supplying a flow of solvent substantially from above to each of said succession of masses at spaced intervals along said path of rotary movement, repeatedly draining solvent so supplied from said succession of masses into a succession of separate solvent-receiving zones positioned beneath said succession of masses and along said rotary path, and circulating solvent from a plurality of said separate solvent-receiving zones to a plurality of said supplying steps.

5. Solvent extraction is an old art, dating back to as early as 1843. It became a commercial reality in about 1900. Between the World Wars, at least sixty different schemes were evolved to meet the demand for larger, more efficient extractors. By 1939, however, the best available extractors were the Bollman "Vertical Basket Extractor" and, of lesser importance, the Hildebrandt extractor.

Although the Bollman and the Hildebrandt extractors were widely used, they both had well recognized disadvantages.

The Bollman was a vertical structure utilizing a series of baskets on an endless path. In order to make this design economically practical it required that the extractor be some four or five stories tall. This required in turn a large exterior construction for housing the extractor. The design involved a great number of moving parts which were a ready source of mechanical problems. The feeding of oil bearing material, solvent, and miscella [1] to the baskets was necessarily intermittent. The Bollman extractor was thus inherently limited as to practical maximum and minimum size design limits: beyond those limits the extractor could

not be constructed or operated with economy. The oil bearing material had to be carefully prepared to attain satisfactory extraction.

The Hildebrandt extractor utilized the principle of an ordinary meat grinder: the solvent was pushed through one way and the oil bearing materials were pushed through the opposite way. External equipment was required to drain the spent material, or flakes, and to remove a quantity of fine solid particles from the miscella. Filtration was poor and the quality of the miscella was thus poor.

The Bollman extractor was, in summary, more expensive to manufacture, install, and operate; the Hildebrandt was less efficient in extracting oil, and the oil and the spent material recovered were of varying and generally poorer quality.

6. Between 1935 and 1945, many large organizations joined in the search for a cheaper, more effective, more efficient solvent extractor. Procter & Gamble Company, a dominant processor, and French Oil, the leading company devoting itself to the building of oil mill machinery, were active in the search. Although many improvements were suggested and adopted, the basic mode of operation and the quality of extraction of the available extractors remained unaltered. The Bollman extractor remained the best of the solvent extractors available. There was a long-felt want in the trade for an improved solvent extractor which the "Rotocel" fulfilled in 1949 when it was commercially introduced.

7. Blaw-Knox entered the solvent extraction field in 1943 and began to manufacture Bollman extractors. That year Blaw-Knox employed George B. Karnofsky, a graduate chemical engineer who had no previous experience or background in solvent extraction. Karnofsky was assigned to familiarize himself with the art, and to design and detail a conventional solvent plant. Not satisfied with convention, however, Karnofsky con-

---

1. Miscella is the mixture of solvent and oil.

ceived and perfected the invention of the patent in suit—the "Rotocel."

8. The Rotocel [2] utilizes a vertical-axised cylindrical rotor compartmented by radial walls into wedgeshaped contiguous cells disposed like the cut pieces of a pie. Each cell is open at the top. Each cell has a perforated hinged bottom. The rotor is mounted on an axial shaft which is motor driven so as to turn the rotor at constant speed. There is a feeding complex above the rotor having stations for feeding solvent, miscella, and a "slurry" of prepared oil seeds and miscella as the cells move sequentially under the different feeding stations. Below the rotor, there is a series of wedgeshaped receiving chambers into which miscella drains through the perforated bottoms of the cells. There is a dumping station at which the perforated bottoms are successively opened so as to dump the solid residues after the oil has been extracted from them. The bottom is automatically returned to its closed position before the now-emptied cell moves through the zone below the feed pipe. The component parts of the feeding-receiving complex are interconnected by pump-and-piping systems so that miscella can be pumped from the receiving chambers to the spray nozzles and the slurry-feed pipe. In operation, the solvent, first as fresh solvent and then as miscella, passes through the charges in successive cells, increasing in concentrations of extracted oil until a "full" miscella is achieved and drawn off from the appropriate receiving chamber. The solvent is thereafter separated from the oil and flakes, and the separated solvent is returned to the system. Since the cells are contiguous, there is no spillage of solvent, miscella, or slurry, although all of these are fed continuously to the rotor; and since the miscella-receiving chambers are contiguous, there is no spillage of miscella draining from the cells, although the drainage is continuous.

9. The Rotocel is a great and meritorious step forward in the art. It kept all of the advantages of percolator type extractors, such as the Bollman type, added to it all of the advantages of the immersion-type extractors, such as the Hildebrandt, but without the disadvantages of either. The Rotocel operates at a lower solvent ratio—it requires less solvent to extract a given amount of oil from a given amount of oil bearing material—than previous extractors. The Rotocel permits the continuous feeding of oil bearing material and continuous recycling of miscella to the beds of material. The Rotocel permits flooding of its cells through which greater bed depths are attainable, and it prevents the channeling of liquid through the beds, making the preparation of material much less critical than it is in the Bollman-type extractor. The Bollman extractor has practicable capacity limitations, both minimum and maximum, beyond which it cannot be built and remain competitive. The Rotocel, however, may be scaled-up or down in size reasonably without limit with predictably good results. The Rotocel has greater flexibility: It can be shut down, changed over to different oil bearing material, and restarted with less time and labor than previous extractors. The Rotocel can extract oils with ease from materials whose oil extraction had been very difficult before. The Rotocel, being more compact structurally and less complicated with fewer moving parts, is inherently more trouble free than the Bollman extractor, and it can be manufactured, installed, maintained, and operated at lower costs. The Rotocel yields a consistently clear miscella of a high quality without requiring additional clarification equipment, and it requires less operator effort, and permits a more thorough drainage of the spent material than did previous extractors. In brief, the Rotocel processes more material with less capital and operating costs and with more consistently good results than was possible with any previous extractor.

10. The patent application for the Karnofsky patent was filed on May 4, 1949, one month after the operation of

2. See Appendix A.

the first Rotocel began at the Soy-Rich plant in Wichita, Kansas. During the prosecution of the application, two interferences were declared with two rival applicants—Merz and Andrews. Lengthy interference proceedings followed. This resulted in a judgment which was fully in favor of Karnofsky on February 27, 1956. The patent issued on June 24, 1958.

11. The Karnofsky patent is not disclosed in any of the patents relied on by defendants. Defendants state that they made an all-out search of the world literature in an effort to find new prior patents and publications which were not cited in the Patent Office. They rely on twelve patents and one foreign publication to show that the Karnofsky invention lacks novelty. The most pertinent, and heavily relied on, of these patents, the Bollman British Patent No. 156,905, the DeLime Patent No. 97,059, and the Smith Patent No. 2,176,107 were all considered by the Patent Office during the prosecution of the Karnofsky application, and the Karnofsky application was allowed over them. The other patents relied on involved no substantial element which was not disclosed by these patents and considered by the Patent Office.

12. The Rotocel has enjoyed outstanding commercial success. It has been accepted and adopted by the industry as a whole. During the period from 1946 to 1955, there were seven rival manufacturers of solvent extractors manufacturing Hildebrandt type and Bollman type extractors in the United States. There are now only French Oil, manufacturing the French Oil extractor, or the Upton extractor, and Blaw-Knox, manufacturing the Rotocel, and a couple of other small factories. In the period from 1948 to 1966 sixty-two Rotocels have been sold by Blaw-Knox, and Rotocel sales have continuously been increasing. Blaw-Knox has licensed several foreign manufacturers to build and market Rotocels abroad, including Harburger Eisen Und Bronze Werke of Germany.

This company abandoned the manufacture of the Hildebrandt extractor in favor of the "Rotocel". This indicates a recognition of the Karnofsky invention and it indicates the magnitude and stature of the invention.

13. The Karnofsky invention as disclosed and claimed in the patent in suit was not anticipated under 35 U.S.C. § 102 by any of the prior art relied upon by defendants. It was admittedly a new combination of existing patents.

14. Considering all of the circumstances as a whole, the Karnofsky invention as disclosed and claimed in the patent in suit was not, and would not, have been obvious to men having ordinary skill in the art at the time the invention was made. It meets all of the requirements of non-obviousness under 35 U.S.C. § 103.

15. The Upton extractor admittedly was inspired by the Rotocel to meet Rotocel competition. Upton and Hutchins of the French Oil Company arranged for a thorough examination of a Rotocel installation at Fostoria, Ohio. Thereafter they attempted to design a machine around the Karnofsky machine, and to avoid patent conflicts. Since the commercial introduction of the Upton extractor in 1960, French Oil has sold thirty-eight Upton extractors and one Bollman-type extractor.

16. Upton's design consists essentially of an arrangement whereby the cell complex stands still while the feeding complex above and the receiving complex below rotate. The Upton extractor [3] has all the elements of the Rotocel and has them in the same combinative relationship: both extractors have the same core element—a cylindrical chamber divided into contiguous wedgeshaped cells arranged like the pieces of a cut pie, each open at the top and fitted with a hinged perforated bottom. Both extractors have the same complex above the cells for feeding solvent, miscella, and slurry to the cells. Both have the same complex below the cells for col-

3. See Appendix B.

lecting miscella, and for pumping it back to the feed complex above the cells, and for removing spent flakes and "full" miscella from the extractor. Functionally, the Rotocel and the Upton extractor are identical. Structurally, the only difference is that there is a reversal of parts: in the Rotocel the cylindrical chamber rotates and the feeding and receiving complexes stand still, whereas in the Upton extractor the cylindrical chamber stands still and the feeding and receiving complexes rotate in unison. The relative motion of the feeding and receiving complexes to the cylindrical chamber is the same in each case. This reversal of parts requires some pipes and troughs in the Upton extractor that are not present in the Rotocel but the presence of these additional elements does not alter or affect the essential identity of the two extractors.

The Upton extractor performs the same function in substantially the same way to obtain the same results as the Rotocel. The Upton extractor enjoys all of the benefits and advantages over the prior art extractors attributed to and accomplished by Rotocel.

The essential identity of the Rotocel and the Upton extractor is strikingly apparent from the exhibit models. See Appendixes A and B.

### CONCLUSIONS OF LAW

1. Jurisdiction of the district court under 28 U.S.C. § 1338(a) and 28 U.S.C. § 1400(b) is not disputed, and the matter is properly before the court.

2. The Blaw-Knox Company is the owner of the Karnofsky patent by force of an assignment from George B. Karnofsky, and the Company has standing to bring the action.

3. The Karnofsky patent is valid. It discloses new and useful invention, and it meets all statutory requirements. See e. g., United States v. Adams, 383 U.S. 39, 48, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966); Marvel Specialty Co. v. Bell Hosiery Mills, Inc., 330 F.2d 164, 170–171 (4th Cir. 1964); Entron of Maryland, Inc. v. Jerrold Electronics

Corp., 295 F.2d 670, 674 (4th Cir. 1961); Otto v. Koppers Co., 246 F.2d 789 (4th Cir. 1957) cert. denied 355 U.S. 939, 78 S.Ct. 427, 2 L.Ed.2d 420 (1957). The Karnofsky patent meets the requirements set out by the Fourth Circuit in Colgate-Palmolive Co. v. Carter Products, 230 F.2d 855 (4th Cir. 1956) cert. denied 352 U.S. 843, 77 S.Ct. 43, 1 L.Ed.2d 59 (1956), for validity as a combination patent.

A combination is a composition of elements, some of which may be old and others new, or all old or all new. It is, however, the combination that is the invention, and is as much a unit in contemplation of law as a single or noncomposite instrument. The authorities establish the following propositions respecting the patentability of devices or processes of this character: * * * (4) When the several elements of which it is composed produce by their joint action either a new and useful result, or an old result in a cheaper or otherwise more advantageous way. 230 F.2d at 862.

The defendants have strenuously argued that Graham v. John Deere Co., 383 U.S. 1, 11–17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), holds by implication that a combination patent must, in order to be valid, produce new, unusual or surprising results. As the court reads the case, the subject matter need not be surprising: it must be simply non-obvious. "Patentability is to depend, in addition to novelty and utility, upon the 'non-obvious' nature of the 'subject matter sought to be patented to a person having ordinary skill in the pertinent art.'" 383 U.S. at 14, 86 S.Ct. at 692. The Court held in *John Deere* that the level of innovation necessary to sustain patentability remained the same as announced in Hotchkiss v. Greenwood, 11 How. (U.S.) 248, 13 L.Ed. 683 (1851):

[U]nless more ingenuity and skill * * * were required * * * than were possessed by an ordinary mechanic acquainted with the business, there was an absence of skill and ingenuity which constitute essential

elements of every invention. In other words, the improvement is the work of the skillful mechanic not that of the inventor. 11 How. (U.S.) at 267. The Rotocel met all of the requirements, and the patent is valid.

■ 4. It is further concluded that the *doctrine of equivalents* is applicable to this case. That doctrine was discussed in Long Mfg. Co. v. Holliday, 246 F.2d 95 (4th Cir. 1957), and this authority is relied on by the defendants. As a principle of law it is, of course, binding in this court. However, when applied to the facts of this action, the principle enforces the plaintiff's claim.

In *Long Mfg. Co.* Judge Haynsworth restated the reasonable range of equivalents to which a patent was entitled: the range is governed by considerations of the state of the prior art, the novelty and contribution of the claimed invention, the nature and extent of the differences between the patented and accused devices, the scope of the claim of the patent, and the limitations inherent in it and other surrounding circumstances. The swordpoint of the defendants' argument is based on the third consideration—the nature and extent of the differences between the patented and the accused devices. That argument is that Upton displayed ingenuity in developing the pipes and troughs for material input that made the stationary basket extractor possible. The assertion may indeed be true, however a comparative glance at the two devices [4] leads to the conclusion that the ingenuity in developing the Upton feed system was not directed toward inventing the Upton machine but to accomplish the reversal of stationary and moving parts of the Rotocel. Reflection on the evidence and arguments lead to the same conclusion.

5. Under the circumstances, the Upton extractor is the equivalent of the Rotocel, and it responds to the elements of apparatus claim 8: its normal and intended operation clearly responds to

the elements of method claim 32 excepting the reversal of the moving and stationary parts. It is concluded therefore that the Upton extractor infringes claims 8 and 32, and that *Hartsville Oil* and *French Oil* are each infringers. See Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) reh. denied 340 U.S. 845, 71 S.Ct. 12, 95 L.Ed. 620; Wine Ry. Appliance Co. v. Baltimore & Ohio R. Co., 78 F.2d 312, 316–319 (4th Cir. 1935); Wachs v. Balsam, 38 F.2d 50, 51 (2nd Cir. 1930); Schmidinger v. Welsh, 243 F.Supp. 852, 862 (D. N.J. 1965).

6. French would invoke the doctrine of file wrapper estoppel as a defense to the doctrine of equivalents. The argument is essentially that in order for the plaintiff to prevail on the doctrine of equivalents—that there was a reversal of parts—it is necessary to broaden the claims of the Karnofsky patent to include "relative motion", and that this they are estopped to do because the term "relative motion" was included in original claim seventeen which was abandoned.

■ The doctrine of file wrapper estoppel was invoked by the Fourth Circuit in Power Curbers, Inc. v. E. D. Etnyre & Co., 298 F.2d 484 (4th Cir. 1962). It, however, does not arise by the mere cancellation of broader claims, but only when the allowance of the claim depends specifically upon the verbal change in controversy. Hunt Tool Co. v. Lawrence, 242 F.2d 347, 353–354 (5th Cir. 1957) cert. denied 354 U.S. 910, 77 S.Ct. 1296, 1 L.Ed.2d 1428 (1957); Toy Ideas, Inc. v. Montgomery Ward & Co., 172 F.Supp. 878, 882 (D. Md. 1959); Waterproof Insulation Corp. v. Insulating Concrete Corp., 153 F.Supp. 626, 628–629 (D. Md. 1957). In this case the quality of relative movement was not the salient point of novelty in claim 17 which was rejected and abandoned. Claim 17 was rejected because it, and

---

4. See Appendix A. and B.

other claims in a group rejection, did not define the rotary mechanism:

> [They] are considered readable on and are rejected as unpatentable over the structural combination of Bollman. * * * The limitation of the axially rotatable nozzle is considered an unpatentable mechanical equivalent over the spray heads of Bollman.

See Smith v. Snow, 294 U.S. 1, 15, 16, 55 S.Ct. 279, 79 L.Ed. 721 (1935). This is not a proper case for the application of file wrapper estoppel, because its relative movement was not the quality which prompted rejection of claim 17.

7. The plaintiff is entitled to judgment, enjoining defendants, its officers, servants, agents, and those in privity with it from any further infringement of the patent at suit, and to an accounting to determine the amount of damages to which the plaintiff is entitled as a result of the infringement, and to recovery of the costs of the action.

The counterclaim is dismissed.

And it is so ordered.

Appendix A

THE KARNOFSKY EXTRACTOR THE ROTOCEL

Appendix B

THE UPTON EXTRACTOR